ARKANSAS ELECTRIC ENERGY CONSUMERS *v.*
ARKANSAS PUBLIC SERVICE COMMISSION and
Arkansas Power and Light Company

CA 90-276 813 S.W.2d 263

Court of Appeals of Arkansas
En Banc
Opinion delivered June 26, 1991

48

*Kirkland & Ellis*, by: *Stephen A. Herman*; and *Rose Law Firm, A Professional Association*, by: *Herbert C. Rule III* and *Stephen N. Joiner*, for appellant.

*Gilbert Glover, Lee McCulloch*, and *Paul R. Hightower*, for appellee Arkansas Public Service Commission.

JUDITH ROGERS, Judge. This is an appeal from Orders 17 and 18 of the state Public Service Commission in its Docket No. 89-128U. The appellant is Arkansas Electric Energy Consumers (AEEC), a voluntary association of large industrial customers of Arkansas Power and Light Company.[1] The appellees are the Arkansas Public Service Commission (APSC), Arkansas Power and Light Company (AP&L), which are here to defend the Commission action, and the Attorney General, who participated below but has not filed briefs here.

This case was commenced before the APSC by AP&L on June 21, 1989. AP&L asked the APSC to approve a Stipulation and Settlement Agreement ("Agreement") entered into by AP&L, the Attorney General, and the APSC staff. The Agreement's major provisions address what amounts to a considerable restructuring in the manner and means by which AP&L proposes to conduct its business. The portions of the agreement at issue in this appeal involve the transfer of AP&L's interests in two generating plants to a sibling corporation named Entergy Power, Inc. (EPI)[2], a bulk power marketing company owned by AP&L's parent company, Entergy Corporation.[3] The plants are the

---

[1] The AEEC members participating in this case are: Acme Brick Company, Alumax Aluminum Corporation, Aluminum Company of America, Archer Daniel Midland, Arkansas Aluminum Alloys, Arkansas Chemicals, Inc., Arkansas Lime Company, Berry Petroleum Company, ConAgra Frozen Foods (Batesville), ConAgra Frozen Foods (Russellville), Cross Oil & Refining Company, Ethyl Corporation, Great Lakes Chemical Corporation, Halstead Metal Products, International Paper Company, Lion Oil Company, Producers Rice Mill, Quincy Soybean Company, Razorback Steel, Reynolds Metals Company, Riceland Foods, SMI Steele, Superwood Corporation, Temple Inland Forest Products, Tyson Foods, Inc., U.S. Vanadium Corporation, Viskase Corporation, and Weyerhaeuser Company.

[2] At hearings, EPI had not been formed and AP&L sometimes referred to the proposed company by the name "NEWCO."

[3] Entergy corporation is organized and operating under the Public Utility Holding Company Act of 1935 and owns all the common stock of four retailing subsidiaries: AP&L, Mississippi Power and Light Co. (MP&L), Louisiana Power and Light Co.

Ritchie Steam Electric Station Unit No. 2 (Ritchie 2), an oil/gas burner rated at 544 megawatts (MW) of power located near Helena, and the Independence Steam Electric Station Unit No. 2 (ISES 2), a coal burner rated at 842 MW located near Newark. AP&L owns 31.5% of ISES 2, which amounts to 265 MW of generating capacity. The total capacity involved, therefore, is 809 MW.

The ISES 2 capacity has never served Arkansas customers; rather, it was leased by MP&L from the time ISES came on line in December 1984 through December 1989. As of the date of the APSC hearings, it had a remaining useful life of about forty-four years. Ritchie 2 became operational in 1968 and has a remaining useful life of about twenty-seven years.

By the Agreement, AP&L proposed to sell the 809 megawatts of generating capacity to EPI at book value (approximately $171 million) and to have a right to purchase electricity from those plants (to the extent such is not obligated to other EPI customers outside the Entergy system) at cost as needed. Thus, the fixed costs associated with ownership in those generators will be avoided by AP&L.

The Agreement also provides (1) for the transfer of management and operation (but not ownership) of the two generating units of Arkansas Nuclear One (ANO) plant at Russellville to Entergy Operations, Inc. (EOI), a sibling company owned by Entergy Corporation, (2) for recovery of certain deferrals from ratepayers, and (3) for amortization and retention of certain investment tax credits (ITC's).

The points for reversal, as articulated in its brief by the appellant, are:

> I. The PSC Staff's Pre-Filing Commitment to Support the Settlement Violated Due Process.
>
> II. The Commission Failed to Consider Fair Market Value [of the plants].
>
> III. The Settlement was not Supported by Substantial Evidence.

---

(LP&L), and New Orleans Public Service, Inc. (NOPSI), along with all the stock in several related subsidiaries, including EPI.

On June 22, 1989, AEEC was granted intervenor status, conditioned upon its identifying its membership. A dispute ensued over the issue of identification, but AEEC identified its membership on August 30, 1989, and was granted full status as an intervenor the following day.

A procedural schedule was established by the Commission, bifurcating AP&L's application into two phases, Phase II to deal with the transfer of the ISES 2 and Ritchie 2 plants and Phase I to deal with all other issues. Phase I issues were heard on January 3 and 4, 1990, and Phase II issues were heard on February 9, 12, and 13, 1990. On April 2, 1990, the Commission issued Order No. 17, which granted the application with several modifications. On May 1, 1990, AEEC requested a rehearing and stay of Order No. 17. The request was denied on May 31, 1990. On June 28, 1990, AEEC filed a Notice of Appeal with this Court, seeking review of Order No. 17 and requesting that this Court stay the APSC's order. On July 3, 1990, this Court issued a *per curiam* opinion which denied the appellant's request for a stay. *Ark. Electric Energy Consumers v. Ark. Public Service Comm'n*, 31 Ark. App. 217-A, 791 S.W.2d 719 (1990). The Supreme Court denied AEEC's request for review of this Court's stay on September 10, 1990. AEEC filed its abstract and brief on September 12, 1990. AP&L and the APSC filed supplemental abstracts and briefs on October 19, 1990, and AEEC filed its reply brief on November 13, 1990. Oral arguments were heard April 24, 1991.

The voluminous record in this case consists of nearly 4,000 pages, most of which contain the testimony and exhibits of the dozen or so witnesses who testified on the various issues below. Because so much of the parties' disagreement goes to the substance of the evidence, a brief overview of some of the more salient testimony at the hearings below is appropriate.[4]

R. Drake Keith, President and Chief Operating Officer for AP&L, testified that AP&L was seeking permission to sell the generating plants because the Commission found in a previous rate case that AP&L had 969 MW of "excess generating

---

[4] Although the case was heard in two separate Phases below, some witnesses testified at both Phases, and for purposes of simplicity here, any such testimony is merged for summary.

capacity." Excess generating capacity is that capacity over and above what is required to meet peak system demand, plus a reasonable reserve. Keith testified the Agreement's ultimate purpose was to hold down rates and obviate the need for a rate increase in the near future, except in certain limited circumstances.

According to Keith, the ISES 2 sale would eliminate the need for $23 million in additional revenues, a figure representing the annual lease payments to AP&L from MP&L for the plant. He testified that, according to his company's analysis, AP&L and the rest of the Entergy electric system will not need any additional generating capacity until 2000 or beyond and that, if additional capacity becomes necessary in the interim, combined cycle capacity or cogeneration projects would be less expensive in present net value terms than retaining Ritchie 2 and ISES 2.

Keith testified the proposed cost of the transfer would be $171 million, a figure which represents original cost adjusted to compensate for income taxes netted against the depreciated original cost, with the proceeds to be used to retire high cost securities, thereby reducing AP&L's cost of capital, which would reduce the need for future rate increase. He also pointed out that, by transferring the coal-fired ISES 2, AP&L could avoid the costs of dealing with charges which could be mandated by acid-rain legislation.

With regard to the nuclear management issue, he testified that, by transferring management responsibility for ANO to a nuclear management subsidiary, significant savings could be realized. He emphasized that AP&L will retain control over the nuclear-fired plants. Keith also set forth the reasons why the company wanted authorization to recover deferrals (about $4.4 million) due to the excess capacity adjustment and how, in his opinion, amortization of investment tax credits could positively affect AP&L's net earnings by about $10.9 million without impacting retail rates.

As to Phase II issues, Keith affirmed AP&L's position that sale of Ritchie 2 and ISES 2 would be beneficial to ratepayers over the coming 10 to 20 years. He explained a "rate cap" proposal whereby AP&L rates would be limited in any event to what rates would be if the plants were not sold. Under the rate

cap, if ISES 2 and Ritchie 2 were to be transferred, AP&L would keep records, subject to annual PSC audits, reflecting the costs of retaining the units versus savings from selling the units.

As to the cost of transferring the generators, Keith said that it was his understanding that SEC regulations require that transfers between affiliates of public utility holding companies be at cost and that the proposed transfer from AP&L to EPI would be at book value, which is cost less depreciation. Keith also said it was AP&L's position that the company would in all likelihood not need to build additional generating capacity for at least 15 years.

Lee W. Randall, Senior Vice-President of Finance and Administration and Chief Financial Officer for AP&L, addressed, from a management perspective, how the status quo would change if the Agreement is approved and said, in his opinion, that AP&L's customers would benefit.

T. Gene Campbell, Vice-President and Senior Nuclear Executive for AP&L, said there would be potential savings at ANO of about $7.6 million if the Commission decided to allow management transfer to a nuclear management company. On cross-examination, however, he acknowledged that, even without the management transfer, savings of about $2.8 million could also be achieved with modifications in current management practices.

Sandra Hayley, Management Audits Supervisor of the PSC Staff, testified about the proposal to transfer management of ANO to a nuclear management company. She addressed particular safeguards to be accomplished through an ongoing evaluation that could assure that the consolidation of management is in the public interest. Hayley also proposed some changes in the company's Operating Agreement to satisfy regulatory concerns. Essentially, she testified favorably to the Settlement Agreement, provided adequate oversight and documentation of savings could be maintained.

Russell D. Widmer, Senior Technical Policy Analyst of the PSC Staff, testified about two aspects of the settlement, one involving recovery of excess capacity deferrals and the other dealing with the amortization of ITC's. He proposed some modifications in the bookkeeping methods AP&L proposed to use in regard to ITC's, noting that more than one method is available

by which ITC's could be amortized.

John Strode, Manager, Electric Section, PSC Staff, headed the PSC staff investigation of AP&L's current rates and the settlement's revenue requirement effects. He concurred with AP&L's position that its rates would not need to be adjusted if ISES 2 and Ritchie 2 are sold. He also agreed with the proposal as to amortization of ITC's. Strode oversaw some considerable accounting and economic analyses of AP&L's financial condition and the potential impact of the settlement agreement. One of Strode's conclusions was that, with the termination of the ISES 2 lease, AP&L's current retail revenue situation would result in a revenue deficiency of slightly over $21 million. Strode testified that, even if the proposed sale is completed, AP&L would have a revenue deficiency of $5.5 million. He said that the sale would not wipe out the total $21 million deficiency because of other factors such as reduced reserve equalization revenues, fuel adjustment clause savings, and elimination of excess capacity deferrals because AP&L would no longer have excess capacity. His testimony supported the position taken by AP&L that, if the settlement is approved, no rate adjustments would be needed but that, without the sale of ISES 2 and Ritchie 2, AP&L might be entitled to seek rate relief of about $21 million.

Strode also testified to rebut an assertion by AEEC witness Falkenberg that the off-system sales potential (wholesale to other companies outside allocated service territory) of ISES 2 and Ritchie 2 is identical whether or not the plants are sold. Basically, Strode said that, if sold, the sale potential of the units would be greater because the price of energy would be lower due to lower revenue requirement for the two plants.

Donna Gray, Director of Management and Financial Analysis, PSC Staff, testified at the hearing. Gray's stated purpose in testifying was to address the issue of whether the settlement was in the public interest and to evaluate AP&L's required rate of return. She said the proposed sale of ISES 2 and Ritchie 2 would be of significant benefit to ratepayers in present value terms. She stated that, according to projections by Staff member Lou Ann Westerfield, AP&L's total revenue requirement would decrease by about $26.8 million if the plants were sold, compared with a present value cost of holding the plaints at about $96.3 million.

The net present value of selling versus holding, according to Gray, was $410.3 million to ratepayers. Gray said that selling the plants at book value would be beneficial to ratepayers.

Gray also agreed with Hayley's conclusion that transfer of ANO management to a nuclear management company was in the public interest and would benefit ratepayers. She also summarized Widmer and Strode's analysis of ITC amortization and recovery of deferrals of excess capacity returns. The ITC amortization, Gray said, would reduce AP&L's revenue requirement by $14.7 million, with the deferrals totalling $1.8 million.

Gray also testified in support of a rate moratorium, modifying the excess capacity adjustment and AP&L's financial condition in general. She concluded by saying:

> The Staff has thoroughly analyzed each aspect of the Stipulation and quantified the ratemaking effects of each provision. Having weighed the respective detriments and benefits of each point, I concluded that the Stipulation, as a whole is in the public interest. The stipulation offers AP&L an opportunity to significantly reduce costs, and ensures that the ratepayers will not suffer a rate increase for several years. I, therefore, recommend that the Commission approve the Stipulation as filed.

Dr. Jay B. Kennedy, President, Kennedy and Associates, testified on behalf of AEEC. He said that the sale of ISES 2 and Ritchie 2 at depreciated book value as proposed would not be advisable. He pointed out that the sale at $171 million amounted to a cost of $215 per kilowatt of capacity and that oil/gas capacity (Ritchie 2) probably cannot be replaced for less than $300 per KW. Further, he said that the replacement cost for ISES 2 coal capacity would be at least $1,500.00 per KW. Dr. Kennedy cited several examples of what it would cost to build replacement units. He estimated total replacement cost for the two units to be $561 million. He said that fair market value rather than depreciated book value should be the measure of price. He also disputed the results of a cost-of-service study AP&L conducted at the PSC staff's request. Kennedy stated in general terms that he had reservations about the remainder of the settlement's provision and also suggested calculating AP&L's return on equity at 12.35% instead of 13.00%, as used by staff.

Kennedy also testified during Phase II in rebuttal to AP&L and staff witnesses. In essence, Kennedy pointed out that nothing is certain in the future and that there is room for disagreement over whether or not the sale of the plants would be beneficial to ratepayers over the long run. His quarrel was general and not at all specific. Kennedy said that AEEC would prefer to take its chances on a general rate case and its outcome instead of having the ISES 2 and Ritchie 2 units sold and a rate case avoided.

Rodney Gilbreath, Manager of Revenue Requirements for AP&L, testified about Dr. Kennedy and Strode's analysis of AP&L's cost-of-service study. He pointed out that it was based on a 1988 test year and that, if AP&L filed a general rate case, the test year would be 1989 or later, carrying with it increased costs and, therefore, resulting in an even larger revenue deficiency. Gilbreath said he thought Strode's analysis was reflective of a minimum possible rate increase, not a maximum, and that Kennedy's position was untenable, in his opinion.

Jack T. Blakely, Manager, Pricing and Economic Analysis for AP&L, disputed Kennedy's analysis of AP&L's return on equity, which was 12.35%. His testimony criticized the methods and assumptions by which Kennedy calculated AP&L's cost of equity.

Basil L. Copeland, Jr., an Economist with Chesapeake Regulatory Consultants, Inc., of Annapolis, Maryland, was retained by the PSC staff to evaluate AP&L's evaluation study as to the market value of ISES 2 and Ritchie 2. The study concluded that the market value of ISES 2 and Ritchie 2 was not measurably in excess of depreciated book value. Copeland said that the study was flawed and did not actually measure the plants' value. "If the actual life of the units turns out to be greater than the life assumed in determining the recovery of book value through depreciation, the market value will be greater than the book value, a fact obscured by the Burns and McDonnell [AP&L's consultant] study," Copeland said. Copeland addressed costs and revenues under various scenarios with regard to the plants, along with related data.

William T. Clarke, Project Manager, Economic Studies Department, Burns and McDonnell Engineering Company, was hired by AP&L to provide an opinion as to the fair market value

of ISES 2 and Ritchie 2. Clarke went into a great deal of detail about this country's energy markets and how electric companies in particular go about their business. He discussed "market value" versus "book value" and how these figures, while usually close early in a generating plant's life, may diverge over time. The ultimate conclusion of the study was the market value of the combined generating capacity of 809 megawatts represented by ISES 2 and Ritchie 2 could range from $0.00 to $425,356,688, with a "weighted average" of $174,357,922. He noted that the net book value for ISES 2 is $150,090,800.27, and the net book value for Ritchie 2 is $20,239,675.44, for a combined total of $170,330,475.71. Thus, the study concluded that the market and book value of the generating plants did not differ substantially.

Tom D. Reagan, Manager, AP&L Energy Resource Planning, addressed the proposal to sell the plants and discussed options available for replacement of ISES 2 and Ritchie 2 capacity in the future. He said four supply-side alternatives were found acceptable in the event unexpected capacity additions become necessary, all involving more efficient generation technology than the two plants. Reagan testified extensively and sponsored numerous exhibits which illustrated in great detail AP&L's current generating capacity and projections for future needs in that regard.

Jack L. King, Senior Vice-President, System Executive-Operations, Entergy Corporation, testified about Entergy's proposal to establish a bulk power marketing subsidiary company (EPI) to own ISES 2 and Ritchie 2 along with other generators. He testified about the manner in which the company would operate in marketing the power capacity it acquires and addressed the effect on intercorporate relationships in the Entergy corporate structure.

Randall J. Falkenberg, Vice-President, Kennedy and Associates, Utility Consultant for AEEC, testified that the Settlement Agreement and transfer of generating units would not be in the ratepayers' best interests, that AP&L's studies were biased due to errors and incorrect or unreasonable assumptions, that PSC staff's position was based on incorrect analyses of the biased AP&L studies, and that the Commission should not approve the Agreement. Falkenberg's extensive testimony went into great

detail about the reasons for his conclusion and gave examples and numbers as to why he concluded as he did. He thoroughly criticized Reagan's analysis. Falkenberg said he thought that a ten-year study was too short a time frame within which to analyze the economics of selling versus retaining the two generating plants because the plants' useful lives exceeded that amount of time. He analyzed the variables in AP&L's study and disagreed with many of those used, such as capacity factors and cogeneration, and demonstrated how, with different variables AP&L's own study would conclude that the sale was ill-advised.

Charles Cicchetti, Managing Director, Putnam, Hayes & Bartlett, Inc., was hired by AP&L to respond to Kennedy and Falkenberg's assertions. Essentially, this witness testified that, in his opinion, Kennedy and Falkenberg's analyses were incorrect. He criticized Falkenberg's conclusions with regard to cogeneration options included in AP&L's study and testified that the Commission would still maintain a great deal of control over AP&L's activities even if it allowed the plants to be removed from its direct jurisdictional authority.

Lou Ann Westerfield testified for the PSC staff. She was questioned extensively by counsel for appellant about a meeting she attended with Jerrell Clark, of the PSC staff, Dr. Keith Berry, her supervisor at the PSC, Ralph Teed of AP&L, and Tom Reagan of AP&L, where the company presented its proposal to sell the plants. Westerfield testified about her instructions with regard to analyzing AP&L's proposal and said that her analysis essentially verified AP&L's position. Several alleged deficiencies in her testimony were pointed out by other witnesses, some of which she corrected or modified. Her position that the proposed sale was beneficial to ratepayers did not change, however.

For reversal, AEEC first contends that it was denied due process because of certain alleged *ex parte* contacts between AP&L and the Chairman of the PSC and the PSC staff before any application was filed. AEEC claims that, commencing in March of 1989 and over the following two months, there were numerous meetings between AP&L, the PSC staff, and the office of the Attorney General which culminated in execution of the Agreement at issue on June 5, 1989. The PSC staff and the Attorney General, in the agreement, agreed to support the

adoption of it by the Commission.

At the heart of AEEC's argument are the Supreme Court's comments in *General Tel. Co.* v. *Arkansas Public Service Commission*, 295 Ark. 595, 751 S.W.2d 1 (1988), where the Court said:

> The company argues that it was improper for the commission to allow its staff to seek the rehearing of its order which resulted in the reduction of the amount of new revenue it was to allow the company. The statute governing rehearings before the commission, Ark. Code Ann. § 23-2-422 (1987), provides, in subsection (a), that application for rehearing may be made by "[a]ny party. . .aggrieved by an order issued by the commission." The commission argues it has the power to make rules and that it has, by its Rule 1.05, provided that its staff is to be bound by the commission's rules as a party. In the first order issued in this case, the commission designated the staff as a party. The commission argues that the company waived its right to object to the staff being treated as a party before it by not raising the issue until it filed its motion to dismiss the staff's rehearing application.

> A quick look at the statutes providing for rate hearings before the commission shows the commission to be, without doubt, a quasi-judicial body. *See* Ark. Code Ann. §§ 23-2-401 through 23-4-424 (1987 and Supp. 1987). It is troublesome that an agency which is placed in a decision-making role can have its own staff before it as a party. Even if the internal operating procedures of the commission kept the commissioners totally isolated from their staff, and we assume that is not the case, we would find a serious appearance of impropriety in this situation. It is a little like a judge making his or her law clerk a party to a case even though the law clerk has a close association with the judge, is his or her employee, and has the judge's ear before and after the hearing.

> We have real doubts about this situation, especially now that the Arkansas Attorney General may represent the public interest in these cases, Ark. Code Ann. § 23-4-305 (1987). In this case, however, we find no specific,

unfair prejudice in permitting the staff to ask for rehearing. Arkansas Code Ann. § 23-2-426(a) (1987) provides: "The commission may at any time, and from time to time, after notice, and after opportunity to be heard as provided in the case of complaints, rescind or amend by order any decision made by it."

While we find no prejudice resulting from the treatment of the staff as an adverse party before the commission in this case, this opinion should not be read as generally approving a situation we regard as giving an appearance of impropriety. In other instances prejudice may be demonstrated to have resulted from this apparent conflict. For now, we will reserve judgment on the matter.

According to PSC chairman Sam Bratton's testimony, while he was legal counsel to Gov. Bill Clinton just prior to being named PSC Chairman, he was involved in a meeting with AP&L management and said he found the proposal "interesting" and "worth considering." AEEC argues that the effect of *ex parte* contacts may be seen in that the entire agreement was approved as submitted with only a few modifications, i.e., the "rate cap" and oversight provisions with regard to changing nuclear operations management. Essentially, AEEC claims the PSC staff, the Attorney General, and AP&L colluded to assure approval of the settlement.

Appellant also points out that Ark. Code Ann. § 23-4-305 (1987) provides as follows:

The Consumer Utilities Rate Advocacy Division [of the office of Attorney General] shall represent the state, its subdivisions, and all classes of Arkansas utility rate payers and shall have the following functions, powers, and duties:

(1) To provide effective and aggressive representation for the people of Arkansas in hearings before the Arkansas Public Service Commission and other state and federal courts or agencies concerning utility-related matters.

(2) To disseminate information to all classes of rate payers concerning pertinent energy-related concepts.

(3) To advocate the holding of utility rates to the

lowest reasonable level.

AEEC contends that, because the Attorney General bound himself to support the agreement, he was incompetent to perform his duty to provide aggressive representation for the people.

The APSC counters appellant's bias claim by first pointing out that AEEC never objected to the Commissioners hearing the case. It cites several cases in support of the proposition that any objection on the basis of bias was untimely. AP&L points out that the APSC chairman testified on the record at the outset of the proceedings about the March 1989 meeting, detailing those present and what was said. Further, appellee argues that, from the very words spoken, no possibility of bias was demonstrated to exist. As the APSC staff participation, it says:

> *Ex parte* communications, as defined by APSC procedural rule 1.06 are: "off-the-record communications *to any member of the Commission or hearing examiner* in such proceeding reasonably designed to influence a decision on any issue of fact in a contested proceeding." [Emphasis added.] The same rule defines "contested proceeding" to mean:
>> . . .in which a petition or notice to intervene in opposition to requested Commission action has been filed.

AP&L argues that there is no evidence any such contacts with Commissioners occurred and points out that Commission Order No. 18 in this proceeding states none occurred. Finally, AP&L points out that AEEC itself has joined the PSC staff in entering into settlements before the PSC.

On the issue of staff participation, PSC found the challenge to be untimely because AEEC could have filed its Motion as early as August 31, 1989, but did not file until February 6, 1990. The Commission said that AEEC had knowledge of all facts pertinent to the issue at the earlier date, and hence waived the issue. In Order No. 18, it discussed at great length the participation of agency staff in administrative agency proceedings and noted that no bias or detriment and been demonstrated.

■ The Supreme Court of the United States, in *Withrow* v. *Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), addressed a similar question and said:

Concededly, a "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). This applies to administrative agencies which adjudicate as well as to courts. *Gibson* v. *Berryhill*, 411 U.S. 564, 579 (1973). Not only is a biased decisionmaker constitutionally unacceptable but "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison, supra*, at 136; cf. *Tumey* v. *Ohio*, 273 U.S. 510, 532 (1927). In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him. [Footnote omitted.]

The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

\* \* \*

That is not to say that there is nothing to the argument that those who have investigated should not then adjudicate. The issue is substantial, it is not new, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons. No single answer has been reached. Indeed, the growth, variety, and complexity of the administrative processes have made any one solution highly unlikely.

\* \* \*

It is not surprising, therefore, to find that "[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of due process. . . ." 2 K. Davis, Administrative Law Treatise § 13.02, p. 175 (1958). Similarly, our cases, although they reflect the substance of the problem, offer no support for the bald proposition applied in this case by the District Court that agency members who participate in an investigation are disqualified from adjudicating. The incredible variety of administrative mechanisms in this country will not yield to any single organizing principle.

\* \* \*

That the combination of investigative and adjudicative functions does not, without more, constitute a due process violation, does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high.

*Withrow* v. *Larkin*, 421 U.S. at 46-47, 51, 52, and 58.

Appellant, in attacking the procedure below as a denial of due process, has the burden of proving its invalidity. *Omni Farms* v. *AP&L*, 271 Ark. 61, 607 S.W.2d 363 (1980). In Public Service Commission proceedings, due process must be preserved to all whose legal rights are involved and concluded by the Commission's final order. *Public Service Commission* v. *Continental Telephone Company*, 262 Ark. 821, 561 S.W.2d 645 (1978). A fundamental requirement of due process in matters of public utility regulation is a full and fair hearing. *Shields* v. *Utah Idaho Central Railroad Co.*, 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111 (1938). An elementary element of a full and fair hearing is that all whose rights are involved have the opportunity to be heard, to submit evidence and testimony, to examine witnesses and present evidence or testimony in rebuttal to adverse positions. *Federal Trade Commission* v. *National Lead Co.*, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957).

We have reviewed the voluminous record below and

cannot sustain appellant's claim that it was denied due process. The only evidence concerning pre-filing negotiations was that the PSC Chairman, prior to his appointment to that position, was privy to a conversation concerning AP&L's proposal to sell the plants and found it "interesting." The Chairman, who spoke on the record to the substance of his exposure to the proposal and was presumably susceptible of cross-examination by appellant, was not shown to have been biased or prejudiced by the conversation. Indeed, a fair reading of the plain language recalled by the Chairman demonstrates merely that he was receptive to hearing the particulars of the proposal and does not reveal a commitment about the matter on his part.

PSC staff witnesses Strode and Westerfield were extensively cross-examined about pre-filing contacts with AP&L. Neither expressed what could be construed as having a predetermined agenda prior to investigating the proposal, and their testimony shows that their assigned tasks were to verify or refute the validity of AP&L's proposal. The testimony reveals that there were other individuals from AP&L and the PSC staff involved in discussions which led to the agreement in issue here, all of whom could have been, but were not, called as witnesses on the issue of whether the pre-filing contacts violated appellant's due process rights.

We cannot agree that the record supports appellant's contention that the attorney general's support of the Agreement violates the statutory mandate of Ark. Code Ann. § 23-4-305 (1987). The record is devoid of any evidence that the attorney general failed to provide "effective and aggressive representation for the people of Arkansas" or failed "to advocate the holding of utility rates to the lowest reasonable level." To the contrary, a plain reading of the agreement discloses that the attorney general was in fact attempting to fulfill that mandate in signing the agreement. Throughout the agreement are recitations as to why the parties agree that the public interest would be best served by adoption of its provisions.

In sum, there was no evidence that the Commission proceedings were directed to a predetermined outcome or that they were tainted by the PSC staff's contacts with AP&L. The Commission was free to accept or reject the proposal in whole or

in part. Appellant was afforded every opportunity to participate in the proceedings below, and in fact did so with competent vigor. The simple fact that it did not achieve the result it sought is not tantamount to a denial of due process. We therefore reject appellant's claim that the proceedings below denied it due process.

██ Parenthetically, we observe that this case was filed with the Commission on June 21, 1989, and that appellant's first objection to staff's participation was in January 1990. Although appellant was thoroughly involved in the case from August of 1989, it did not object to the staff's participation for at least four months. The objection was untimely, and appellant cannot, for that reason alone, be afforded relief on its objection. *Pass Word, Inc.* v. *Federal Communications Commission*, 673 F.2d 1363 (D.C. Cir. 1982), *cert. den.* 459 U.S. 840 (1982). Moreover, although appellant has requested this court to disqualify the Commission and remand the matter for hearings before another Commission, it never requested any such relief until now. We do not consider arguments raised for the first time on appeal. *Mitchell* v. *Goodall*, 297 Ark. 332, 761 S.W.2d 919 (1988).

██ We also note that utility regulation is by its very nature a complicated, unconventional undertaking and that the various jurisdictions at both federal and state levels have created administrative systems not unlike Arkansas' for dealing with cases such as these.[5] We note that it has been emphasized repeatedly in the cases that the Public Service Commission is a creature of the legislature and performs, by delegation, legislative functions. As such, it possesses the same powers as the General Assembly while acting within its legislatively-delegated powers and has very broad discretion in exercising those powers. *City of Fort Smith* v. *Ark. Public Service Commission*, 278 Ark. 521, 648 S.W.2d 40 (1983). Because the Commission acts in a legislative capacity and not in a judicial one, orders of the Commission are viewed as having the same force and effect as

---

[5] For an excellent, brief overview of regulatory systems and a discussion of issues similar to those in this case, see *Attorney General of the State of New Mexico* v. *New Mexico Public Service Commission and Public Service Company of New Mexico*, 808 P.2d 606 (1991).

would an enactment of the General Assembly. *Bluefield Water Works and Improvement Co.* v. *Public Service Commission,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

We hold that the appellant was afforded a full and fair opportunity to be heard and that appellant has failed to demonstrate a clear showing that the limits of due process have been overstepped or that an arbitrary result has been reached. Our inquiry, therefore, goes no further. *Arkansas Power & Light Co.* v. *Arkansas Public Service Commission,* 226 Ark. 225, 289 S.W.2d 668 (1956).

Next, AEEC contends for reversal that the Commission failed to consider fair market value in pricing the plants.

Arkansas Code Annotated § 23-3-102 (1987) provides in pertinent part:

> (a)(3) . . . [A]ny utility may sell, acquire, lease, or rent any . . . property constituting an operating unit. . . .
>
> (b)(2) . . . If [the PSC] finds that the proposed action is consistent with the public interest, it shall give its consent. . . .
>
> (3) In reaching its determination, the PSC shall take into consideration the reasonable value of the property, plant, equipment, or securities of the utility to be acquired or merged.

And, Rule 6.02(b) of the PSC's Rules of Practice and Procedure provides that an application by a utility to sell property shall include "[a]n accurate detailed description of the property to be sold or leased, together with the original cost to applicant and applicant's statement as to the present value thereof." AEEC contends that present market value rather than depreciated book value is the proper measure of cost and claims that there may be a "premium" on the plants which should inure to the benefit of ratepayers.

AP&L counters flatly that Ark. Code Ann. § 23-3-102(3) (1987) simply does not apply in this case because the statute's application "is limited to cases where property is acquired by or merged into another public utility," and that EPI, the proposed purchaser, is not a public utility. It points out that the practical

reason for this is that when a public utility buys property it affects its rate base and, consequently, rates, whereas when a public utility sells property, it removes it from rate base and, along with it, the ratepayers' obligation to pay a reasonable rate of return. AP&L also contends that, even if the statute applies, it does not mandate a valuation methodology but simply specifies that the Commission *consider* the reasonable value of the property to be transacted.

While the APSC's brief does not direct itself to the applicability of the statute, it essentially parallels AP&L's assertion that the statute simply requires that the Commission take into consideration the plant's reasonable value and affirms that is precisely what was done in this case. The PSC staff's brief also extensively addresses the "premium" issue and observes that the issue has been retained for full consideration in AP&L's next general rate case. It takes the position that, while the transfer price may be adequately determined at this time, the existence of a premium may not be and that, in any event, it would be more appropriately considered in a rate case where rates could be adjusted to allow for any premium.

With these same principles of statutory construction in mind, we cannot accept AEEC's argument that the Commission must, in assessing a proposed sale of utility assets, use "fair market value" as the only criterion of value in considering whether to allow its consummation. Section (b)(3) of the statute merely mandates that the "reasonable value" of the asset "shall" be considered by the Commission in reaching its decision. Appellant contends that the Commission failed to comply with its statutory mandate. We cannot agree. The record is replete with assessments of the plants' value and the bases and considerations underlying those assessments. Depending on which portion of which witnesses' testimony and supporting exhibits one chose to accept as valid, the plants' value is anywhere from zero to about a half billion dollars. The Commission chose to accept depreciated book value as a reasonable value of the property, and that decision was supported by ample competent evidence on the record before it. Simply because AEEC's witnesses disagree with the valuation at book instead of some other method is not enough for us to disturb the Commission's findings.

Moreover, we note that the Commission specifically reserved for the future the issue of whether there is some value over and above book value which should accrue to the benefit of AP&L's customers. Further, the Agreement, as approved with considerable modifications obviously designed to protect ratepayers, contains a "rate cap" provision designed to insure that no harm to AP&L customers, including appellant's membership, can occur in the form of higher rates because of the sale of the plants to EPI; indeed, we can find no quantifiable risk of harm to appellant or other ratepayers in the record before us.

Finally, AEEC claims this court should reverse the Commission because the settlement was not supported by substantial evidence. Appellant states that "[t]he critical issue is whether it will cost more to hold ISES 2 and Ritchie 2 until needed than to build replacement capacity." Inasmuch as the answer to the question is a matter of obvious dispute on the record below, we observe that there are probably several correct and supportable solutions, depending on one's viewpoint. One writer recently articulated an answer to a similar issue as follows:

> It depends. It depends on the size of the utility and its power needs; it depends on the rating agencies and how they will gauge buy vs. build decisions; and it depends on state public utility commissions (PUCS). In the final analysis, it depends on a whole host of issues, some of which a company can control, some of which it cannot.

C. Greenberger, "Buy, Build — or Save?" *Public Utilities Fortnightly*, Vol. 127, No. 9, p. 35 (May 1, 1991).

AEEC vigorously argues that staff witness Westerfield had committed some errors and miscalculations in fuel and maintenance calculations related to the long-term effects of selling ISES 2 and Ritchie 2 and that no reliance whatsoever may therefore be placed on the PSC staff's recommendation. The PSC counters that, while some errors were made, they were subsequently corrected in supplemental testimony for Phase II, and Westerfield's analysis still showed that transfer of the units would be beneficial. AP&L points out that the PSC Order itself says that, even if staff had not participated, it would have granted the application based on AP&L's and AEEC's evidence alone. Order No. 18 states at page 3697 of the record:

It is possible to review the record in this Docket relying only on the testimony of two parties, AP&L and AEEC. Were we to make our decision on that basis, the Commission would find, as it did in Order No. 17, that AP&L has met the burden of proof that its Application should be granted and that there is substantial evidence of record that the Application of AP&L is in the public interest. Based upon the record in this proceeding without regard to Staff's testimony, it is our opinion that the record reflects that the Application of AP&L should be approved as in the best interest of all of AP&L's ratepayers.

Appellant, on the other hand, argues that, because Westerfield's original position contained some errors, the Commission erred in not adopting Falkenberg's recommendations. It also contends that, because Westerfield and Strode's testimony did not completely agree, the acceptance of the settlement was not supported by substantial evidence. The PSC staff contends, on the other hand, that AEEC is incorrectly comparing the two witnesses and points out that Westerfield's testimony went to the costs and effects of transferring the plants versus retaining them, whereas Strode addressed AP&L's present revenue situation if the plants were included or not included in the revenue requirement calculation. In other words, they argue that the two witnesses' testimony involved different issues altogether.

Arkansas Code Annotated Section 23-2-423(c)(3), (4), and (5) (1987) defines this court's scope of review with regard to appeals from the Arkansas Public Service Commission:

(3) The finding of the commission as to the facts, if supported by substantial evidence, shall be conclusive.

(4) The review shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United State or of the State of Arkansas.

(5) All evidence before the commission shall be

considered by the court regardless of any technical rule which might have rendered the evidence inadmissible if originally offered in the trial of any action at law or inequity.

In *Arkansas Oklahoma Gas Corporation* v. *Arkansas Public Service Commission*, 27 Ark. App. 27, 770 S.W.2d 180 (1989), we said:

> On appeal, we give due regard to the expertise of the Commission, which derives its authority from the Arkansas General Assembly. *City of Fort Smith* v. *Arkansas Public Service Commission*, 278 Ark. 521, 648 S.W.2d 40 (1983). The Arkansas Public Service Commission has broad discretion in exercising its regulatory authority. *Associated Natural Gas Co.* v. *Arkansas Public Service Commission*, 25 Ark. App. 115, 752 S.W.2d 766 (1988); *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission*, 19 Ark. App. 322, 720 S.W.2d 924 (1986); *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission*, 18 Ark. App. 260, 715 S.W.2d 45 (1986); *Walnut Hill Telephone Co.* v. *Arkansas Public Service Commission*, 17 Ark. App. 259, 709 S.W.2d 96 (1986). Judicial inquiry terminates if the action of the Commission is supported by substantial evidence and its action is not unjust, unreasonable, unlawful or discriminatory. *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission*, 24 Ark. App. 142, 751 S.W.2d 8 (1988). It is the province of the Commission as the trier of fact, to assess the credibility of the witnesses, the reliability of their testimony, and the weight to be accorded the evidence presented. *Arkansas Public Service Commission* v. *Continental Telephone Co.*, 262 Ark. 821, 561 S.W.2d 645 (1978); *Associated Natural Gas Co.*, *supra*; *General Telephone Company of the Southwest* v. *Arkansas Public Service Commission*, 23 Ark. App. 73, 744 S.W.2d 392 (1988).

27 Ark. App. at 282.

> To establish an absence of substantial evidence to support the decision the appellant must demonstrate that the proof before the administrative tribunal was so nearly undis-

puted that fair-minded men could not reach its conclusion. [citation omitted] . . . [T]he question is not whether the testimony would have supported a contrary finding but whether it supports the finding that was made.

*Williams* v. *Scott*, 278 Ark. 453, 455, 647 S.W.2d 115, 116 (1983). A decision of an administrative agency may be supported by substantial evidence even though this court might have reached a different conclusion had we heard the case *de novo* or sat as the trier of fact. *Fouch* v. *State, Alcoholic Beverage Control Division*, 10 Ark. App. 139, 662 S.W.2d 181 (1983). We observed in *General Telephone Co. of the Southwest* v. *Ark. Public Service Comm'n,* 23 Ark. App. 73, 744 S.W.2d 392 (1988):

As the trier of fact in rate cases, it is within the province of the appellee to decide on the credibility of the witnesses, the reliability of their opinions, and the weight to be given their evidence. The appellee is never compelled to accept the opinion of any witness on any issue before it. The appellee is not bound to accept one or the other of any conflicting views, opinions, or methodologies. *Arkansas Public Service Commission* v. *Continental Telephone Co.*, 262 Ark. 821, 561 S.W.2d 645 (1978).

*General Telephone*, 23 Ark.App. at 83.

In *American Telegraph & Telephone Co., et al.* v. *United States, et al.*, 299 U.S. 232, 236 (1936), the United States Supreme Court said:

This court is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action here involved, it is not enough that the [administrative action] shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse.

After the hearings, the Commission issued a fifty-five-page order (No. 17), in which it found that, with the return of ISES 2 to AP&L, the company would have a revenue deficiency in excess of $21 million according to Strode's analysis and in excess of $14 million according to Kennedy. It noted that AEEC took the

position, however, that only a general rate case could yield reliable data but observed that the data was based on a cost-of-service study, which is the elementary component of a rate case. The PSC stated: "We find that the evidence of record presented by both Staff and AP&L conclusively supports the proposition that without approval of the Stipulation, AP&L would almost certainly seek and would probably be entitled to a significant rate increase." The Commission also concluded that the evidence "clearly establishes" that new technology generators would be less costly to ratepayers in net present value terms than retaining ISES 2 and Ritchie 2 should the need to build units arise. The PSC noted that Reagan testified the net present value benefit would be from $33 million to $62 million over the next ten years. The Order said that staff's analysis verified the results of AP&L's analysis that the sale of the generators would benefit ratepayers, lowering AP&L's revenue requirement by nearly $27 million and that the net present value would between $90 million and $107 million. It also found that ISES 2 and Ritchie 2 would not be needed to meet projected current loads for ten to thirteen years. The Commission concluded:

> The record in this proceeding clearly and substantially shows that ISES 2 and Ritchie 2 are not currently needed; that the 809 megawatts of capacity represented by those plants will not be needed until at least the year 2000 and probably even beyond; and, that it is substantially more economical to sell those plants now and replace them in the future as opposed to holding them in reserve as urged by AEEC. The evidence in this proceeding clearly shows that the only prudent course of action is to sell these plants and eliminate the financial threat they carry for AP&L's ratepayers. When additional capacity is needed, ten to fifteen years or more out in the future, more economical alternatives will be available. AP&L's ratepayers should not be expected or asked to foot the high cost now of plants which they don't need when more economical alternatives can be exercised in the future.

As noted, the proposed transfer was to be at depreciated book value of about $171 million, and some witnesses testified that the SEC requires transfers between subsidiaries of Public Utility holding companies to be accomplished at book. It appears

that the rationale for this is to prevent "churning" of assets among sibling corporations owned by a single parent.

 Although the parties do not directly address the issue in their briefs, Section 10 of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79j (1982), has been interpreted to prohibit a sales transaction at profit between affiliates of companies regulated under the Act, with the price of such transactions limited to cost. *See e.g.*, *In the Matter of Georgia Power Company*, S.E.C. Docket Release No. 23448 (Oct. 10, 1984); *see generally Kripke*, A Case Study in the Relationship of Law and Accounting: Uniform Accounts 100.5 and 107 (1944), 57 Harvard L. Rev. 693, 705-708. While the wisdom of requiring corporate books of affiliated corporations to reflect sales transactions among them at cost is obvious, we agree with counsel for appellant's observation at oral argument that the same is not necessarily true for ratemaking purposes. Indeed, the Commission's order in this case specifically reserved for future rate cases the matter of whether a "premium" inuring to the AP&L ratepayers' benefit exists. We think such a reservation is prudent.

The Commission found that market value and book value on Ritchie 2 and ISES 2 did not differ significantly. It specifically found the testimony of Copeland for the PSC staff and Falkenberg for AEEC, whose opinions differed considerably from AP&L's, to have been "thoroughly discredited" on cross-examination, and rejected a bidding procedure as a means to establish the value of the plants. The Commission specifically stated that, in reaching its decision, it had "taken into consideration the reasonable value" of ISES 2 and Ritchie 2 as required by Ark. Code Ann. § 23-3-102 (1987), and said:

> The evidence of record in this proceeding clearly establishes that the sale of ISES 2 and Ritchie 2, even at book value, is more economically beneficial to ratepayers than holding the plants for future use. Other aspects of the Stipulation, unrelated to the sale of ISES 2 and Ritchie 2 discussed hereinafter, further require a finding that approval of the Stipulation, taken in the aggregate, is in the public interest.

AP&L may proceed with the sale of ISES 2 and Ritchie 2 to EPI at book value if it so desires. However, the

Commission is not bound, *for ratemaking purposes*, by the book value transfer of these plants. The issue of whether or not the plants have a fair market value in excess of their book value and whether or not any such premium above book value should be shared with ratepayers is specifically reserved and will be deferred until such time as AP&L files its next general rate case proceeding.

The Order also approved the "rate cap" proposal as in the public interest and specified that (1) EPI would not serve retail or wholesale customers in Arkansas without approval, (2) that EPI would not enter into capacity sales with any Entergy affiliates without Commission approval, (3) reserved the right to inspect and audit EPI's books, (4) AP&L would retain a right of first refusal to repurchase ISES 2 and Ritchie 2 at depreciated book value should EPI desire to sell those units. The PSC also approved a rate moratorium proposed by AP&L, finding that it provided "significant potential economic benefit" to ratepayers and was in their best interests.

The Order outlines in great detail the proposal to transfer management of the nuclear plants to a management company and specified several complex and highly technical conditions which may be found at pages 37-40 of Order No. 17, appearing in the record at pages 3563-3566. It found that AEEC's objections to the management change were theoretical and stated that the conditions it imposed adequately addressed those concerns. It therefore approved the management change.

With regard to recovery of excess capacity deferrals, the Order said "AEEC has failed to offer any evidence which would demonstrate that AP&L's and Staff's projections regarding when the associated excess capacity will become used and useful are either based on unreliable data or unreasonable." It found that recovery of the deferrals was in the public interest and should be approved. Likewise, it found amortization of investment tax credits to be supported by the testimony and in the public interest and approved that proposal.

In essence, appellant disagrees with the Commission's acceptance of some testimony and rejection of other testimony, and in support of its position points out to the Court those issues where its witnesses disagreed with what the Commission adopted.

 It has often been said that, if an order of the Commission is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, or discriminatory, then this court must affirm the Commission action. *Walnut Hill Telephone Co.* v. *Ark. Public Service Commission*, 17 Ark. App. 259, 709 S.W.2d 96 (1986); *City of Forth Smith, supra; Ark. Power and Light Co.* v. *Arkansas Public Service Commission*, 226 Ark. 225, 289 S.W.2d 668 (1956).

In *Williams* v. *Scott*, 278 Ark. 453, 455, 647 S.W.2d 115 (1983), the supreme court said:

> To establish an absence of substantial evidence to support the decision the appellant must demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded men could not reach its conclusion. [citation omitted] . . .[T]he question is not whether the testimony would have supported a contrary finding but whether it supports the finding that was made.

And, the rule is that we view only the evidence most favorable to the appellee in cases presenting questions of substantial evidence. *General Telephone Co.* v. *Arkansas Public Service Commission*, 272 Ark. 440, 616 S.W.2d 1 (1981).

 In consideration of the above, we simply cannot sustain appellant's position. As discussed earlier, we have reviewed all of the extensive evidence in this case. In consideration of appellee's evidence, we cannot find the evidence in support of the agreement to be anything short of substantial.

It is obvious that the various expert witnesses' approaches to the issues before the Commission diverged considerably. Certainly, not all of them could be correct, and in all probability, none of them are absolutely correct because no one or no system can accurately predict what the future may hold.

Public utility regulation, by its very nature ". . .involves judgment on a myriad of facts," and ". . .has no claim to an exact science." *Colorado Interstate Gas Co.* v. *Federal Power Commission*, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); *Acme Brick Co.* v. *Arkansas Public Service Commission*, 227 Ark. 436, 450, 299 S.W.2d 208 (1957). The Commission here evaluated the diverse and conflicting predictions and analyses of

the many witnesses and found the proposed transaction to be of quantifiable benefit to the ratepayers of AP&L. We cannot, on the record before us, find that the decision is not supported by substantial evidence.

The decision below is affirmed in all respects.

Affirmed.

CRACRAFT, C.J., and COOPER, J., concur in the result.