AT&T COMMUNICATIONS of the SOUTHWEST, INC. *v.* ARKANSAS PUBLIC SERVICE COMMISSION

99-860 40 S.W.3d 273

Supreme Court of Arkansas
Opinion delivered March 22, 2001
[Petition for rehearing denied April 26, 2001.]

*Wright, Lindsey & Jennings LLP*, by: *N.M. Norton* and *J. Mark Davis*, for appellant.

*Paul J. Ward*, for appellee Arkansas Public Service Commission.

*Timothy S. Pickering*, for appellee Southwestern Bell Telephone Company.

*Chisenhall, Nestrud & Julian, P.A.*, by: *Lawrence E. Chisenhall, Jr.*, and *Michael T. Jackson*, for appellees Arkansas Telephone Company,

Inc.; Century Telephone of Arkansas, Inc.; Century Telephone of Mountain Home, Inc.; Century Telephone of Redfield, Inc.; Century Telephone of South Arkansas, Inc.; Cleveland County Telephone Company; Decatur Telephone Company; Mountain View Telephone Company; Prairie Grove Telephone Company; E. Ritter Telephone Company; South Arkansas Telephone Company; Tri-County Telephone Company; Yelcot Telephone Company; Yell County Telephone Company.

*Gill Law Firm*, by: *W.W. Elrod II*, for appellees/cross-appellants Madison County Telephone Company, Inc., and Scott County Telephone Company, Inc.

*George Hopkins*, and *Williams & Anderson LLP*, by: *Leon Holmes*, for appellees/cross-appellants Central Arkansas Telephone Cooperative, Inc.; Lavaca Telephone Company, Inc.; Magazine Telephone Company, Inc.; Northern Arkansas Telephone Company, Inc.; Southwest Arkansas Telephone Company, Inc.; Walnut Hill Telephone Company, Inc.

*Stephen B. Rowell*, and *Friday, Eldredge & Clark*, by: *Kevin A. Crass*, for cross-appellees Alltel Arkansas, Inc.; Alltel Mobile Communications, Inc.; and Alltel Communications, Inc.

Tom Glaze, Justice. AT&T Communications of the Southwest, Inc., brings this appeal from Order No. 12 of the Arkansas Public Service Commission (the PSC or the Commission), in which the Commission made certain determinations with respect to the Arkansas Universal Service Fund ("AUSF"). AT&T initially appealed to the court of appeals, which upheld the Commission's order. *See AT&T Communications of the S.W., Inc. v. Arkansas Pub. Serv. Comm'n*, 67 Ark. App. 177, 994 S.W.2d 494 (1999). AT&T now appeals to this court, arguing that the Commission erred in three respects: (1) Order No. 12 is unlawful, because it is based upon Ark. Code Ann. §§ 23-17-404(e)(4)(A) and (B) (Supp. 1999), which are inconsistent with Ark. Const. art. 2, § 19 and amend. 14; (2) § 23-17-404 is preempted by federal law; and (3) Order No. 12 is not supported by substantial evidence.

Because this case deals with the complexities of telecommunications deregulation, some background information is necessary to give the reader an understanding of the issues. During the 1997 session of the General Assembly, the legislature passed Act 77, the "Telecommunications Regulatory Reform Act of 1997" (hereinafter the Act or Act 77). Ark. Code Ann. § 23-17-401 (Supp. 1999).

This statute was enacted in order to bring the telecommunications industry in Arkansas in line with the Federal Telecommunications Act of 1996 (FTA or the Federal Act). The Federal Act essentially provided for the deregulation of the telecommunications industry.

In passing Act 77, the General Assembly stated that its intent was to "[p]rovide for a system of regulation of telecommunications services, consistent with the Federal Act, that assists in implementing the national policy of opening the telecommunications market to competition on fair and equal terms, modifies outdated regulation, eliminates unnecessary regulation, and preserves and advances universal service." Ark. Code Ann. § 23-17-402(1) (Supp. 1999). Further, the legislature asserted that Act 77 was intended to "[r]ecognize that a telecommunications provider that serves high-cost rural areas or exchanges faces unique circumstances that require special consideration and funding to assist in preserving and promoting universal service." Ark. Code Ann. § 23-17-402(2) (Supp. 1999)

Act 77 established the AUSF "in order to promote and assure the availability of universal service at rates that are reasonable and affordable, and to provide for reasonably comparable services and rates between rural and urban areas." Ark. Code Ann § 23-17-404(a)(1) (Supp. 1999). To further that goal, the Act sets forth specific directives for the payment of subsidies from the AUSF to those rural carriers. These requirements include replacing any revenues that a rural carrier loses due to the conversion of the implicit federal universal service funding mechanisms to an explicit universal service funding mechanism as required in 47 U.S.C. § 254. Any rural telephone company that, as a result of changes "caused by new or existing federal or state regulatory statutory directives, experiences a change in intrastate or interstate switched access service revenues, or in net revenues received from the intrastate Carrier Common Line Pool, interstate access charge pools, or the Arkansas IntraLATA Toll Pool[1] [the AITP or Toll Pool], shall be allowed to

---

[1] The Toll Pool was established in 1983 by Public Service Commission Order No. 7 to allow local exchange carriers to recover the costs of providing long distance toll service. "Participation in the Toll Pool was required by Order No. 7, and the Toll Pool agreement provided that all LECs [local exchange carriers] would charge their customers uniform rates for IntraLATA toll calls and contribute these revenues to the Toll Pool. The Toll Pool then redistributed the revenues to the LECs based on their individual needs, causing some LECs to contribute more to the Toll Pool than their actual expenditures and some LECs to receive more in reimbursements than their contributions to the Toll Pool." *Central Ark. Tel. Coop., Inc., v. Arkansas Pub. Serv. Comm'n*, 61 Ark. App. 147, 965 S.W.2d 790 (1998). "LATA" stands for "long distance access transport area."

recover the reductions" from the AUSF § 23-17-404(e)(4)(B). Thus, the AUSF established pursuant to Act 77 ensures that qualifying Incumbent Local Exchange Carriers (ILECs)[2] have a continuing source of subsidies to support their operations.

When an ILEC applies for funding through the AUSF, the ILEC submits its request to the AUSF Administrator. Pursuant to § 23-17-404(e)(4)(C), the Administrator then "verif[ies] the calculations and accuracy of the net revenue reductions, based on a comparison between (i) [t]he total annual revenues received from these sources [i.e., the intrastate Carrier Common Line Pool, interstate access charge pools, or the AITP] by the eligible telecommunications carrier during the most recent twelve months preceding the required regulatory or statutory changes; and (ii) [t]he reasonable projection of total test-year annual revenue after the changes are implemented."

As a result of the passage of Act 77, twenty-one ILECs (denominated the Requesting ILECs, or the appellees here) sent requests to the AUSF Administrator for reimbursements from the fund. On September 3, 1997, the PSC issued Order No. 9, which, using data from the year ending December 31, 1996, adopted an initial AUSF funding level of $6.95 million on an annual basis based upon the recommendation of the ILECs. Order No. 9 further reflected that the figure was "overstated, [was] based upon an unsubstantiated 'uncertainty' regarding LEC to LEC access charges, and [was] unverified." Nevertheless, the figure was adopted by the PSC primarily due to the time constraints imposed by the federal law. The $6.95 million figure was revised on December 8, 1997, when the AUSF Administrator filed a report in Docket No. 97-393-A, reflecting the Administrator's determination that the Requesting ILECs should receive $9.7 million on an annual basis from the AUSF.

AT&T, Alltel, MCI Telecommunications Co., and Sprint Telecommunications Co. filed motions for reconsideration of the Administrator's determination on January 7, 1998. The PSC scheduled a public hearing on these motions and requests for reconsideration for January 21, 1998. After the hearing, the Commission entered Order No. 12 on February 4, 1998. Order No. 12 first discussed the history and purpose of Act 77, and then noted that

---

[2] Incumbent Local Exchange Carrier means a local exchange carrier that is certified by the PSC and that was providing basic local exchange service on February 8, 1996. Ark. Code Ann. § 23-17-403(16) (Supp. 1999).

"the election of alternative regulation pursuant to Act 77 by the majority of ILECs changed the AITP from a mandatory pool to a voluntary pool. . . . The ILECs continued to voluntarily maintain uniform toll rates and voluntarily continued participation in the AITP until October 1, 1997, when the larger ILECs withdrew from the AITP. The losses from the AITP for which the Requesting ILECs sought reimbursement were occasioned by the voluntary dissolution of the AITP on October 1, 1997." Addressing AT&T's concerns that a number of the ILECs had not provided sufficient documentation, Order No. 12 concluded by directing several of the Requesting ILECs to submit additional information to the AUSF Administrator or to revise their requests for reimbursement for certain expenses.

AT&T filed an application for rehearing of the Commission's order on March 6, requesting the Commission to reconsider certain parts of Order No. 12. Specifically, AT&T took issue with the part of the order that found that Act 77 led to the dissolution of the AITP; AT&T also submitted that the portions of Arkansas's law dealing with revenue losses occasioned by Federal Communication Commission (FCC) changes in intrastate access charges were in conflict with, and thus preempted by, 47 U.S.C. § 254. The Company additionally complained that the AUSF Administrator failed to comply with the statutory requirement that it verify the revenue reduction calculations. Finally, the application summarily noted that AT&T challenged the constitutionality of "the entire AUSF regime."

On appeal, AT&T first raises the question of the constitutionality of Ark. Code Ann. § 23-17-404. AT&T argues that §§ 23-17-404(e)(4)(A) and (B) create a perpetuity in violation of Ark. Const. art. 2, § 19, and that these statutes also constitute local or special legislation in violation of Ark. Const. amend. 14. The Commission rejected AT&T's constitutional arguments that were raised in a limited fashion in that company's post-hearing brief. In disposing of this issue, the Commission wrote that "[w]ere [we] to find this section of Act 77 to be in violation of the State Constitution and grant the relief requested by [AT&T], it would have the effect of nullifying an entitlement program created by the General Assembly to subsidize the operations of the ILECs. This exceeds the scope of the Commission's jurisdiction."

The first question this court must address is whether or not AT&T preserved these constitutional questions for review. In AT&T's response to the motions for reconsideration filed by Alltel

and Southwestern Bell, AT&T merely asserted that "[t]he potential for conflict of a constitutional kind from this arrangement is obvious, but it may not be necessary to reach that issue." Further, AT&T stated that "[t]here is also a problem under the Arkansas Constitution, which prohibits the creation of 'perpetuities and monopolies.' . . . Act 77 appears to create a perpetual right to a certain amount of money in certain corporations, funded by what amounts to a general levy on all telecommunications service subscribers. As such it represents exactly what is prohibited by art. 2, § 19 [of the Arkansas Constitution]. In addition, this unique privilege conferred upon certain corporations by Act 77 may also run afoul of art. 2, § 17 and Amendment 14 of the State Constitution as special and preferential legislation." Similar assertions were stated in AT&T's post-hearing brief. Moreover, in its application for rehearing of Order No. 12, AT&T "renewed its claim" that the AUSF violated these constitutional provisions.

█ Our court has addressed the question of whether an administrative agency has the authority to *declare* a statute unconstitutional. In *Lincoln v. Arkansas Public Service Commission*, 313 Ark. 295, 854 S.W.2d 330 (1993), we held that to allow the Public Service Commission to declare unconstitutional a statute that it was required to enforce would violate the separation of powers doctrine. However, this does not mean that a constitutional issue should not be *raised and developed* at the administrative level.

██ This precise question has been considered in the context of other administrative agencies, such as the Workers' Compensation Commission. In *Hamilton v. Jeffrey Stone Co.*, 6 Ark. App. 333, 641 S.W.2d 723 (1982), the court of appeals held that questions of constitutional magnitude must be addressed at the administrative agency level before such questions will be considered preserved for appeal. The court wrote as follows:

> Until now, this court has not been asked whether constitutional questions must first be presented at the Commission level. The general rule is that the constitutionality of a statute will not be considered if raised for the first time on appeal. *See e. g., Sweeney v. Sweeney*, 267 Ark. 595, 593 S.W.2d 21 (1980). This rule has also been followed by appellate courts in appeals from workers' compensation commissions and other administrative agencies. *E.g., Lewis v. Anaconda Co.*, 543 P.2d 1339 (Mont. 1975); *Benson v. North Dakota Workmen's Compensation Bureau*, 250 N.W.2d 249 (N.D. 1977); and *Unemployment Compensation Department v. Hunt*, 17

Wash. 2d 228, 135 P.2d 89 (1943); *see also* 3 A. Larson, The Law of Workmen's Compensation, 78.12 (1976 & July, 1982 Supp.).

Even though the Commission may not have the authority to declare statutes unconstitutional, we believe such issues should first be raised at the Administrative Law Judge or Commission level. Constitutional questions often require an exhaustive analysis which is best accomplished by an adversary proceeding. Obviously this can be done only at the hearing level. Requiring these constitutional issues to be considered by the Commission, we can be assured that such issues will be thoroughly developed before we are asked to rule on a statute's validity.

*Hamilton*, 6 Ark. App. at 335.

■ Subsequent cases have approved this reasoning. *See, e.g.,* *McQuay v. Arkansas State Bd. of Architects*, 337 Ark. 339, 989 S.W.2d 499 (1999); *Arkansas Health Servs. Agency v. Desiderata, Inc.*, 331 Ark. 144, 958 S.W.2d 7 (1998); *Shaw v. Commercial Refrigeration*, 36 Ark. App. 76, 818 S.W.2d 589 (1991). Consistent with the case law above, the General Assembly has provided the specific procedure for review of a Commission order. Among other things, § 23-3-423 provides as follows:

The review shall not be extended further than to determine whether the Commission's findings are supported by substantial evidence and *whether the Commission had regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.*

§ 23-3-423(c)(4) (emphasis added).

■■ The development of facts before the Commission thus is critical, especially in light of the 1985 amendment to the statutes setting out the procedures for judicial review of Commission decisions. Prior to 1985, orders of the Commission were reviewed in Pulaski County Circuit Court. *See* Act 231 of 1973, § 3(b). However, with the passage of Act 770 of 1985, Commission decisions became appealable to the court of appeals. *See* Ark. Code Ann. § 23-2-423(a)(1). Neither this court nor the court of appeals sits as a factfinder. *See Bryant v. Arkansas Pub. Serv. Comm'n*, 62 Ark. App. 154, 969 S.W.2d 203 (1998). Rather, our role is to determine

whether the Commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence. *Id.* (citing *Bryant v. Arkansas Pub. Serv. Comm'n*, 45 Ark. App. 56, 871 S.W.2d 414 (1994)). Thus, the Commission is the only forum where a full development of the facts and law can occur; without that complete development of the facts and arguments below, this court cannot fulfill its reviewing function. Raising such constitutional issues before the Commission is significant even when a statute is challenged as unconstitutional on its face, especially since the interpretation given by the agency charged with its execution is highly persuasive. *See Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 69 Ark. App. 323, 13 S.W.2d 197 (2000).

█ As noted above, AT&T provided only a bare reference to what it believed were issues of constitutional magnitude in its motion for reconsideration and its application for rehearing. No attempt was made to flesh out these constitutional arguments before the Commission, either in AT&T's pleadings or by proffering testimony of witnesses. Nor did AT&T request a ruling or determination by the Commission, or suggest the Commission was wrong in not making a determination. Thus, we hold that AT&T has not sufficiently developed its constitutional arguments to preserve them for this court's review.

We now proceed to AT&T's second point on appeal — that § 23-17-404(e)(4)(A) is preempted by § 254(f) of the 1996 Federal Telecommunications Act. That statutory provision, 47 U.S.C. § 254(f), reads as follows:

> A State may adopt regulations not inconsistent with the [Federal Communication] Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in the State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

AT&T argues that the Federal Telecommunications Act imposed a cap on "corporate operations expenses" at 115% of the

average for a company's area because such expenses did not appear to be costs in providing telecommunications services. AT&T alleges that four of the Requesting ILECs were affected by this cap and included the excess federal Corporate Operations Expense in their AUSF reimbursement claims. In addition, AT&T contends that allowance of these claims at the state level frustrated the federal effort to ensure that carriers use universal service support to offer better service to their customers, and would be inconsistent with the FCC's rules in violation of 47 U.S.C. § 254(f). The appellees respond that this corporate operations expense cap is discretionary, and they also note that the FCC restriction applies only to reimbursement from the federal Universal Service Fund ("USF"), not to reimbursement from state funds.

■ We note, however, that AT&T has not pointed out which four Requesting ILECs made such claims to the AUSF Administrator, nor has AT&T demonstrated that the Administrator's determination was final. Indeed, assuming that the four ILECs are those named in the Commission's Order No. 12,[3] that order directs the ILECs to revise their reimbursement requests to account for the FCC's adjustment of the corporate operations expense that may be recovered from the federal USF; in the event that these ILECs do not submit adjustments, the AUSF Administrator is to revise their reimbursements for them. There is nothing in the record that would indicate whether or not these revisions have been made. The court of appeals declined to reach the issue, holding that AT&T had not shown that the Commission had allowed these claims, and in the absence of any such showing, any opinion which the court might render on the issue would be purely advisory. *See Central Ark. Tel. Coop., Inc. v. Arkansas Pub. Serv. Comm'n,* 61 Ark. App. 147, 965 S.W.2d 790 (1998) (where error is alleged, prejudice must be shown). We agree with the court of appeals' assessment of this issue, and as such, we also decline to address AT&T's arguments.

■ AT&T also raised an argument that Act 77 conflicts with 47 U.S.C. § 254(f) because the Act is not imposed on a competitively neutral basis. However, AT&T never raised this argument below. The statute, Ark. Code Ann. § 23-3-423(c)(2) (Supp. 1999), setting out the procedure for judicial review of PSC orders states that "[n]o objection to any order of the Commission shall be considered by the court of appeals unless the objection shall have

---

[3] Northern Arkansas Telephone Company, Southwest Arkansas Telephone Company, Walnut Hill Telephone Company, and Yell County Telephone Company.

been urged before the Commission in the application for rehearing." While AT&T's application for rehearing asserted that §§ 23-27-404(e)(4)(A) and -404(e)(4)(B) were in direct conflict with 47 U.S.C. § 254(f) and thus preempted by that statute, the application reflected no argument that the statutes were not imposed on a competitively neutral basis. Therefore, this argument can be rejected without further consideration.

Finally, AT&T urges that Order No. 12 is inconsistent with state statutes, and that there was insufficient evidence to support the Commission's decision. AT&T raises three arguments under this heading. First, AT&T contends that the Requesting ILECs' Toll Pool revenue replacement claims do not qualify for reimbursement under § 23-17-404(e)(4)(B). Specifically, AT&T argues that, under Act 77, ILECs qualify for reimbursement only if the revenue reductions are the "result of changes caused by new or existing federal or state regulatory or statutory directives." AT&T asserts that the ILECs' losses were not caused by Act 77 because the Act is not a "new" or "existing" directive. In support of this argument, AT&T insists that a "new" directive would be one arising after the passage of Act 77, and an "existing" one would necessarily have to precede the enactment of the Act.

To answer this claim, we look to the basic rule of statutory construction, which is to give effect to the intent of the General Assembly. *Ozark Gas Pipeline v. Arkansas Pub. Ser. Comm'n*, 342 Ark. 591, 29 S.W.3d 730 (2000). Where the language of the statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. We construe the statute so that no word is left void, superfluous, or insignificant; and meaning and effect are given to every word in the statute if possible. *Id.* However, we will not give statutes a literal interpretation if it leads to absurd consequences that are contrary to legislative intent. *Burford Distributing, Inc. v. Starr*, 341 Ark. 914, 20 S.W.3d 363 (2000).

To adopt AT&T's construction of the words "new or existing" would lead to an absurd result. The General Assembly intended to ease telecommunications providers into deregulation, and established the AUSF as a mechanism for "promot[ing] and assur[ing] the availability of universal service at rates that are reasonable and affordable." § 23-17-404(a)(1). To accept AT&T's argument would mean that the General Assembly must have meant for

any statute other than Act 77 to trigger revenue reductions that would prompt the Requesting ILECs to seek reimbursement from the AUSF. However, AT&T points to no other statute that could have the effect of triggering reimbursement effects, and its argument that Act 77 is neither "new" nor "existing" legislation that would cause a revenue reduction is specious at best.

Next, AT&T contends that Act 77 did not "cause" the Toll Pool reductions. In support of this argument, AT&T claims that it was the voluntary withdrawal of the larger ILECs, such as itself, Southwestern Bell, Alltel, GTE, as well as many of the Requesting ILECs, that caused the Toll Pool losses. Thus, AT&T argues, the dissolution of the Toll Pool was not the result of a state statutory or regulatory directive.

To draw this conclusion, however, requires an attenuated definition of "causation" that this court is not willing to indulge. The effect of Act 77 on the Toll Pool was explained in detail in *Central Arkansas Telephone Cooperative Inc. v. Arkansas Public Service Commission*, 61 Ark. App. 147, 965 S.W.2d 790 (1998). There, the court of appeals looked to the Commission's discussion of the Act's impact on the Toll Pool, in which the Commission wrote as follows:

> In Act 77, the General Assembly clearly provided ILECs the opportunity to elect to operate under alternative forms of regulation and once an ILEC elects alternative regulation, it can flexibly price intraLATA toll services under §§ 8(c) and 12(a) of Act 77. Furthermore, when an ILEC elects alternative regulation, § 11(f) of Act 77 exempts the ILEC from a number of statutory requirements including Ark. Code Ann. § 23-3-114, which requires the maintenance of average message toll service rates. The ILEC deregulatory election provisions in conjunction with the § 11(f) exemptions of Act 77 supersede and vacate the Commission Order requiring mandatory participation of the ILECs in the AITP.

> Based upon Act 77, the Commission finds that . . . the Toll Pool became voluntary with the passage of Act 77[,] and pursuant to Act 77[,] the Commission lacks jurisdiction to require participation in the Toll Pool or to establish the intraLATA toll rates charged by electing ILECs. Therefore, the Commission finds that by operation of law Order No. 7 in Docket No. 83-042-U [establishing the Toll Pool] was vacated effective February 4, 1997, upon enactment of Act 77.

PSC Order No. 9 (July 2, 1997), quoted in *Central Ark. Tel.*, 61 Ark. App. at 152 (internal quotations omitted).

 In sum, by the foregoing passage, the Commission reached the reasonable conclusion that Act 77 made participation in the Toll Pool voluntary, rather than mandatory. It further concluded that the logical outcome of the Toll Pool becoming voluntary was for the larger ILECs, such as AT&T, to cease making contributions to the pool, and as a result, the smaller ILECs that had been dependent on their subsidies received from the Toll Pool suffered revenue losses. The Commission's interpretation of Act 77 was a fair and reasonable one when it stated the Act was the statutory cause for the revenue reductions occasioned by the Requesting ILECs. *See Southwestern Bell Tel. Co., supra* (the interpretation given a statute by the agency charged with its execution is highly persuasive, and while not conclusive, neither should it be overturned unless it is clearly wrong). As such, the Requesting ILECs' claims for Toll Pool revenue replacement do qualify for AUSF funding, and AT&T's argument on this point is without merit.

AT&T next argues that the evidence submitted by the Requesting ILECs to the AUSF Administrator does not meet the criteria of § 23-17-404(e)(4)(C). That statute provides as follows:

> In connection with the receipt of AUSF funds for these changes referred to in subdivisions (e)(4)(A) or (B) of this section, such shall not be conditioned upon any rate case or earnings investigation by the Commission. The AUSF administrator shall verify the calculations and accuracy of the net revenue reductions, based on a comparison between:
>
> (i) The total annual revenues received from these sources by the eligible telecommunications carrier during the most recent twelve (12) months preceding the required regulatory or statutory changes; and
>
> (ii) The reasonable projection of total test-year annual revenue after the changes are implemented.

AT&T contends that the evidence fails to show the AUSF Administrator prepared a total annual revenue projection; rather, AT&T argues, the Administrator relied on certain forms submitted by the Requesting ILECs. The appellees disagree and state that the forms used required annual revenue projections and that the PSC

found those forms sufficient. The appellees also state the Requesting ILECs supplied the Commission with supporting workpapers verifying their calculations; these papers, too, aided the Administrator in his projections.

As mentioned earlier in this opinion, our review of appeals from the Public Service Commission is limited by the provisions of § 23-2-423(c)(3), (4), and (5), which define our standard of review as determining whether the Commission's findings of fact are supported by substantial evidence, whether the Commission has regularly pursued its authority, and whether the order under review violated any right of the appellant under the laws or the Constitutions of the State of Arkansas or the United States. *Bryant v. Pub. Serv. Comm'n*, 46 Ark. App. 88, 877 S.W.2d 594 (1994) (citing *Associated Natural Gas Co. v. Arkansas Pub. Serv. Comm'n*, 25 Ark. App. 115, 752 S.W.2d 766 (1988)). If an order of the Commission is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, nor discriminatory, then the appellate court must affirm the Commission action. *Id.* (citing *Arkansas Elec. Energy Consumers v. Arkansas Pub. Serv. Comm'n*, 35 Ark. App. 47, 813 S.W.2d 263 (1991)). The appellate court views only the evidence most favorable to the appellee in cases presenting questions of substantial evidence, *id.*, and the burden is on the appellant to show a lack of substantial evidence to support an administrative agency's decision. *Id.*

Further, to establish an absence of substantial evidence to support a decision, the appellant must demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach its conclusion. *Bryant v. Arkansas Pub. Serv. Comm'n*, 57 Ark. App. 73, 941 S.W.2d 452 (1997) (citing *AT&T Communications of the Southwest, Inc. v. Arkansas Pub. Serv. Comm'n*, 40 Ark. App. 126, 843 S.W.2d 855 (1992); *Arkansas Elec. Energy Consumers v. Arkansas Pub. Serv. Comm'n*, 35 Ark. App. 47, 813 S.W.2d 263 (1991)). The question on review is not whether the testimony would have supported a contrary finding but whether it supports the finding that was made. *Id.* (citing *Ark. Elec. Energy Consumers*, 35 Ark. App. at 72).

Order No. 12 notes that the Requesting ILECs utilized forms prepared and developed by the AUSF Administrator pursuant to AUSF Rule 3.02(A)(10); these forms instructed the Requesting ILECs to use a test year ending December 31, 1996. The Order goes on to state that the Requesting ILECs "submitted the forms utilizing the . . . test year in compliance with the directive of the

AUSF Administrator." In addition, the Order directs the Requesting ILECs to true-up their requests based on actual annual revenues for the test year once that information is available.

■ We defer to the Commission's findings here, since we need only consider the evidence most favorable to the appellees. We also note that AT&T has failed to abstract the forms the Requesting ILECs submitted to the administrator to show what was included or omitted. Simply put, AT&T has failed in its burden of persuasion on this point. While it makes the assertion that the forms submitted to the AUSF Administrator did not contain a projection of test year revenue, AT&T does not support that contention with any evidence from its abstract or the record. Therefore, we hold AT&T's arguments to be without merit.

Finally, AT&T asserts that even if the evidence submitted by the Requesting ILECs to the Administrator met the criteria of § 23-17-404(e)(4)(C), such evidence did not constitute substantial evidence upon which the Commission could have based Order No. 12. AT&T notes that the Administrator is required to verify the calculations and accuracy of the claimed revenue reductions before allowing the ILECs' reimbursement requests. AT&T relies on its own expert, Michael Pauls, who testified that the AUSF support documents were insufficient to show that the requests were valid. Without proper verification of the figures submitted by the Requesting ILECs, AT&T urges, there was insufficient evidence to support Order No. 12.

■ However, once again, AT&T has failed to abstract the forms submitted by the requesting companies, and as such, there is no way this court can review what the Administrator considered. In addition, while AT&T relies heavily on the testimony of its own witness, the Commission is not required to accept the testimony of any witness. See, e. g., Bryant v. Ark. Pub. Serv. Comm'n, 57 Ark. App. 72, 941 S.W.2d 452 (1997). In such situations, we affirm the factfinder — here, the PSC.

On cross-appeal, the appellees designated as the Rural Telephone Companies[4] (the "RTCs") argue that the Commission erred in interpreting Act 77 so as to make the twelve months preceding September 30, 1997, the base test year for purposes of calculating

---

[4] Central Arkansas Telephone Cooperative, Inc., Lavaca Telephone Company, Inc., Magazine Telephone Company, Inc., Norther Arkansas Telephone Company, Inc., Southwest Arkansas Telephone Company, Inc., and Walnut Hill Telephone Company, Inc.

AUSF support. Under § 23-17-404(e)(4)(C), the Administrator is to verify the calculations and accuracy of the net revenue reductions based on a comparison of "(i) the total annual revenues received from these sources by the eligible telecommunications carrier *during the most recent twelve (12) months preceding the required regulatory or statutory changes*, and (ii) *a reasonable projection of total test-year annual revenue after such changes are implemented.*" (Emphasis added.)

The RTCs contend that the "most recent twelve months preceding the required regulatory or statutory changes" were the twelve months before Act 77's enactment on February 4, 1997, or the year ending December 31, 1996. However, the Commission instead designated the twelve months preceding October 1, 1997, because that was the date on which the Commission determined that the "changes" were implemented and the toll pool was dissolved. The RTCs urge that this decision was in error, because such an interpretation would allow companies to manipulate the funding formula in a manner that cannot have been intended by the legislature. If the test year were after the enactment of Act 77, the RTCs argue, large companies that would not be receiving AUSF funding would have the opportunity to manipulate future AUSF reimbursements by accelerating investments so as to reduce Toll Pool revenues to rural companies during the test year; conversely, the rural companies could try to accelerate investments in an effort to increase their Toll Pool revenues so as to increase subsequent AUSF funding.

The Commission rejected these arguments, however, ruling that "[Toll Pool] reports for the twelve (12) month period ending September 30, 1997, will more accurately meet the requirements in Act 77 of a test year reflecting the most recent twelve months preceding the 'regulatory changes.' " In Order No. 12, the Commission further explained its decision:

> The election of alternative regulation pursuant to Act 77 by the majority of ILECs changed the AITP from a mandatory pool to a voluntary pool. See Act 77, § 11(f). The ILECs continued to voluntarily maintain uniform toll rates and voluntarily continued participation in the AITP until October 1, 1997, when the larger ILECs withdrew from the AITP. The losses from the AITP for which the Requesting ILECs seek reimbursement were occasioned by the voluntary dissolution of the AITP on October 1, 1997. The *most recent test year preceding the voluntary dissolution of the AITP* would be the twelve months ending September 30, 1997, when those reports are finalized. The Administrator is hereby directed to true-up the reimbursement requests based upon AITP

revenues using a test year ending September 30, 1997, by no later than July 1, 1998, and adjust the Requesting ILECs reimbursement requests accordingly.

Again, when reviewing a decision of the Commission, we look to determine if the Commission's decision is supported by substantial evidence. Here, the Commission found that using the year prior to the *implementation* of Act 77 would most appropriately advance the legislature's intent, which was to determine the ILECs' net revenue reduction caused by the Act. As noted above, in order to determine that reduction in revenue, the Administrator was to compare the ILECs net annual revenues from the year before the statutory changes with projected net annual revenues for a year after the changes. The Commission obviously believed that the "changes" meant not the amendment to the statute, but the actual changes in the ILECs' participation in the Toll Pool. These changes did not occur until October 1, 1997, when the larger ILECs pulled out of the Toll Pool.

■ However, we look to the Commission's earlier decision, quoted above in *Central Arkansas Tel. Coop. Inc. v. Public Service Commission*, 61 Ark. App. 147, 965 S.W.2d 790 (1998), where the Commission wrote that the Toll Pool "became voluntary with the passage of Act 77 . . . [and was] *vacated effective February 4, 1997*, upon enactment of Act 77." (Emphasis added.) This is contrary to the Commission's finding in the instant case. If the PSC order establishing the Toll Pool was vacated as of February 4, 1997, then the Toll Pool should have been considered dissolved then, and not on October 1, 1997, as the Commission wrote in Order No. 12. It follows that if the Toll Pool was dissolved as of February 4, 1997, the twelve months preceding the statutory changes should have been determined to be February 1, 1996, through January 31, 1997. Of course, the "twelve months preceding" language in § 23-17-404(e)(4)(C) is not couched in terms of a calendar year, but this test year, designated in terms of calendar months, is more consistent with the financial reporting cycles of the businesses involved. Therefore, while we affirm on AT&T's direct appeal, we reverse on the cross-appeal and remand to the Commission for further action not inconsistent with this opinion.

Special Justices EDWARD MORGAN, JAMES PATE, and PAUL LINDSEY join in this opinion.

BROWN, THORNTON, and HANNAH, JJ., not participating.