ACME BRICK COMPANY *v.* ARK. PUBLIC SERVICE COMM.

5-1144                                          299 S. W. 2d 208

Opinion delivered February 25, 1957.

UNITED STATES OF AMERICA *v.* ARK. PUBLIC SERVICE COMM.

5-1201

Opinion delivered February 25, 1957.

*Gordon E. Young, J. E. Gaughan, Jeff Davis* and *Reuben Goldberg,* Washington, D. C., for appellant.

*John R. Thompson, W. S. Mitchell, Edward L. Wright,* and *Robert Roberts, Jr.,* Shreveport, La., for appellee.

*Osro Cobb,* U. S. Atty., *James W. Gallman,* Ass't. U. S. Atty., and *Major J. C. Kinney,* Washington, D. C., for appellant.

*John R. Thompson, W. S. Mitchell, Edward L. Wright* and *Robert Roberts, Jr.,* Shreveport, La., for appellee.

PAUL WARD, Associate Justice. This appeal challenges a decision of the Arkansas Public Service Commission approving a Rate Schedule submitted to it by the Arkansas Louisiana Gas Company, one of the appellees herein. This litigation however differs from most utility rate cases, in which usually the ultimate goal is to ascertain the proper return to the utility company in dollars and cents, in that here we are concerned not only with the amount of return in money but principally with the method of determining that return.

### THE PRINCIPAL ISSUE.

Heretofore, under the utility rate decisions in this state, and, other states, the amount of money a public utility has been allowed to earn has been related in some way to the amount of money it had invested, or, to state it generally another way, a public utility has heretofore been allowed to earn a certain percent of its "rate base." The "rate base" has not always been arrived at in the same way, but it is always related either to the amount of money invested, the present value of asset, the production costs, the prudent investment value or some other similar factor. Whatever method used in determining the "rate base" the principle heretofore used to determine a fair rate of return for a public utility has been the same.

On this appeal we are called on to approve or disapprove an entirely different, and unrelated, method (requested by appellee, Arkansas Louisiana Gas Company, and approved by appellee, Arkansas Public Service Commission) of determining the rate of return allowable to the Gas Company. The question posed above is, as we see it, the most important one presented by this appeal, although, as it will later appear, there are other issues to be resolved.

DESIGNATION OF PARTIES. The Arkansas Louisiana Gas Company will be referred to as the Company, and the Arkansas Public Service Commission will be referred to as the Commission. The appellants here

were the protestants before the Commission, either directly or by intervention, and for clarity we will refer to them as appellants. Some appellants have chosen to dismiss as to their interest, but these still remain; Acme Brick Company, Columbian Carbon Company, International Paper Company, and Monsanto Chemical Company.

*How litigation began.* On March 12, 1955 the Company, feeling that it was not recovering sufficient revenues under the existing Schedule which had been in force since November 17, 1953, wrote a letter to the Commission asking it to approve a new Schedule proposed, (to be effective April 15, 1955), which was inclosed along with certain substantiating data. The new Schedule, which is shown filed March 14, 1955, provided for an increase in the price of gas to be consumed by the Company's large industrial users — some 34 in number — but for no increase to domestic and small commercial users. The highest rate fixed by the new Schedule was 30 cents per one thousand cubic feet (m. c. f.) for the first 1,000 m. c. f. used in a period of one month, and the lowest rate fixed was 17 and one-quarter cents per m. c. f. for 500,000 m. c. f. or more used in a period of a month. The intervening rates were graduated according to the monthly consumption of gas.

Before the new Schedule was to become effective (or could under Ark. Stats. § 73-117) on April 15, 1955, appellants, as respondents before the Commission contended, among other things, that the old Schedule provided the Company with a fair return, that the proposed Schedule was unnecessary, and that it discriminated against them in favor of the other gas customers. On March 30, 1955, the Commission issued its order suspending the proposed Schedule, but after the Company filed a bond for $1,250,000 (as by statute provided) the Commission allowed the Schedule to become effective as of April 15, 1955. On August 22, 1955, the Commission found that under the new rate Schedule the Company had taken in (through July 1955) $1,260,000 more than

the old rate would have produced, and so ordered the Company to execute an additional bond in the amount of $1,000,000, to insure a refund if it should finally be so ordered.

Extended hearings were held before the Commission at which appellants and the Company introduced numerous witnesses and documents, amassing a record of approximately 3,000 pages, and after which the Commission approved the Schedule as it was submitted by the Company, except that two rate adjustment clauses (not material to this opinion) were deleted. This order of the Commission was approved by the Circuit Court, from whence comes this appeal.

*Effect of Commission's Findings.*

Very generally speaking, the overall effect and implications of the Commission's approval of the Company's proposed gas rate schedule were the following: (a) The Company will receive approximately $4,300,000 more revenue annually than it would have received under the old rate schedule, which had been in effect since November 17, 1953; (b) All this additional revenue will be derived from the Company's large industrial users, known as 3-B customers — none to be paid by domestic or commercial users; (c) All of the Company's property devoted to the production of gas — such as gas wells, gas leases, etc. (hereafter called "production property"), valued at approximately $10,000,000, was removed from the rate base; (d) For the purpose of figuring the Company's net income (on gas sold to 3-B customers) it was permitted to carry as a fixed operation charge the field price (i. e. the price the Company pays other producers for its purchased gas in the various fields where it has gas production) for the gas it produces rather than the net cost of production as it has always done in the past under the rate base method; (e) Because the Commission found that certain risks were involved in servicing 3-B customers, the Company was permitted to earn 8% (instead of the traditional 6%— approximately) on the portion of its properties allo-

cated to servicing them, and; (f) The Commission made certain other findings relative to allocation of transmission costs, recoupment for previously acquired property, and working capital, all of which we will consider later.

*Rate Base* v. *Fair Field Price.* As before indicated, one of the important questions presented by this appeal is what method shall be used by the Commission to determine the monetary return a utility shall be allowed to make? Must we adhere to the traditional *rate base* method or can we (if it is found to be in the best public interest) approve the fair field price method which the Commission has adopted?

*The rate base.* As recognized by the Commission in its findings, it has been traditional heretofore to limit the net earnings of a utility company to a percent of its invested capital or some other indication of the extent of its capital assets. In Arkansas the rate base is the prudent investment value of the property of the utility, as defined by the Commission and this Court, and about which definition there is no dispute. It is upon this method of rate fixing that the relationship between the utility, on the one hand, and the public, on the other, has been established. Upon this basis the public grants the utility a monopoly (or a virtual monopoly) to do business and guarantees the right to charge a price that will produce a fair and reasonable return to the stockholders on all the capital invested by them. In return for the public's concessions, the utility is obligated (under the statutes of this state, and under the rate base method) to render services at the lowest possible prices commensurate with a fair and reasonable return on its prudently invested capital. To the above end, the utility holds and must manage its property in the nature of a trusteeship. In the case of *City of Ft. Smith* v. *Southwestern Bell Tel. Co.*, 220 Ark. 70, 247 S. W. 2d 474, at page 85 of Arkansas Reports, we said: ''The utility must use all its receipts as though they were a public trust.''

*The Fair Field Price* as applied to this case. The production property belonging to the Company is val-

ued at around $10,000,000 as compared to its total assets of approximately $93,000,000. With this production property the Company produces about 20% of all the gas it sells to all of its customers. The rest of the gas sold by the Company it buys on the open market from other gas producing companies. The 3-B customers consume approximately 80% of all the gas passing through the Company's lines.

The Commission, by its Order of November 3, 1955, approved the Company's proposal, one effect of which is (as stated previously) to remove the $10,000,000 worth of production property from the rate base and from further jurisdiction of the Commission. Under such order there will be no occasion for the Commission to be concerned with what it costs the Company to produce the gas it sells its customers. This is true because hereafter (under the Commission's order) the cost of production will be the fair field price (as heretofore defined), which in this instance was found by the Commission to be 9.22 cents per thousand cubic feet.

It should be pointed out here that, under the rate base method, the cost (to the Company and the consumers) of producing gas has been lessened by reason of the fact that the Government allows a depletion cost of 27-1/2 per cent on gas producing wells for income tax purposes. Under the Commission's order this tax windfall will no longer inure to the benefit of the Company's gas customers, but it appears that it will inure to the benefit of the Company's stockholders. Commenting on this phase of the case the Commission said: "While the Company has introduced no other method of arriving at the price of gas to be used in the cost of service computations, it takes the position that whatever method is used, the *stockholders are entitled to any benefits from these allowances.*" (emphasis supplied)

It is our understanding, also, that any profit derived from the difference between the fair field price (here determined by the Commission to be 9.22 cents per m. c. f.) and the amount required to produce the Com-

pany's own gas (as it would be figured by the Commission under the rate base method) would likewise inure to the benefit of the stockholders and not the gas consumers.

In view of the above there are other implications that must be anticipated if this court sustained the Commission's adoption of the fair field price method. Some of them are: From now on any disposition the stockholders of the Company make of its valuable production property (valued around $10,000,000) would be of no concern to the Commission or the Company's customers. This is true because the Company's stockholders could sell a part or all of its production properties and put the purchase price in their own pockets, and it would in no way affect the price the consumers would have to pay for gas.

It might be argued that there is no guarantee that the Company can produce gas cheaper than it can buy it on the open market (under the fair field price method), but such an argument is not convincing. Evidently the stockholders feel they will be able to make a profit on the gas they expect to produce and sell to the Company, otherwise they would be unwilling to try it, especially when it is remembered that they are foregoing a virtual guarantee against all losses in gas explorations under the rate base method.

Adoption of the fair field price method suggests a violation of the idea of the trustee relationship which we have said exists between the customers and the stockholders of a utility company. It would place the Company in the position of serving two masters. In order to make money for the stockholders management would be under a duty to sell its own produced gas at as high a price as possible while, out of loyalty to its customers, it would be under a duty to buy its own produced gas as cheap as possible.

If a public utility has the right (or if the Public Service Commission has the power to give it the right)

to dispose of one segment of its assets without any kind of an accounting, then there is reason to fear it might some day be urged that it would have the same right to dispose of another segment or all of its assets in a like manner. This could, of course, lead not only to breach of trust but could defeat the very purpose for which utilities are organized to serve the public.

*Fair Field Price Method Unlawful.* What we have set forth above forces us to the conclusion that the Public Service Commission has no authority, in the absence of further legislation, to discard the rate base method in favor of the field price method in determining the net profits a public utility can earn in this state. In fact it is difficult to pose the question of a proper net return for a public utility company without stating the answer. This is true because the very concept of "net return" means a return on some kind of a basis, and that basis has traditionally been (in some way) the capital prudently invested.

We cannot read our statutes creating and defining the powers and duties of the Public Service Commission without concluding that they limit it to the rate base method for regulating the return allowable to a public utility company. In fact it appears that such a method was so obvious that the legislature did not deem it necessary to spell it out. Running through all the pertinent statutes is the idea that earnings or returns are based on the amount of property owned by the utility and on nothing else. To begin with all rates received by a public utility must be "just and reasonable," and if not they are unlawful (Ark. Stats. § 73-204). The Commission has the power to fix just and reasonable rates for public utilities (Ark. Stats. § 73-218) and in order to do so, it is given the power to "fix the value of the whole or any part of the property of any public utility," (Ark. Stats. same Section No. (4)). Also the Commission has the power and authority by order to require any public utility to furnish a verified, itemized, and detailed inventory of its property (Ark. Stats. § 73-220).

The Commission has power to require a public utility to keep a uniform system of accounts subject to its jurisdiction and inspection (Ark. Stats. § 73-221) at all times. A public utility is required to "prepare and transmit to the Commission a certified statement of the gross earnings from its properties" annually, Ark. Stats., 73-248.

The legislature undoubtedly gave the Commission this power to ascertain and keep informed of the assets of a public utility "in order to enable it to perform its duties" as set out in § 73-220 above. That duty, of course, is primarily to establish just and reasonable rates (for a public utility to charge) and a just and reasonable return for the stockholders on the money they have invested.

We have somewhat laboriously set out above the reasons that compel us to this inevitable conclusion: The Commission was not empowered under our present statutes to remove approximately $10,000,000 worth of property out of the Company's rate base (thereby departing from the traditional rate base method), and in lieu thereof to measure the justness and reasonableness of the Company's earnings on an entirely new basis or theory, viz; the fair field price method. If the Commission and this court should embark on the new and untried fair field price method of regulating public utilities, it would amount to abandoning our entire previous experiences and legal concepts in rate regulation which have thus far proved fair and satisfactory. Our thought on this point is well expressed by the language used in the case of *City of Detroit* v. *Federal Power Commission,* 230 F. 2d 810. In that case the Circuit Court of Appeals District of Columbia, in speaking of the rate base method (as compared to the fair field price method) said: "It has been repeatedly used by the Commission (Federal Power Commission), and repeatedly approved by the courts as a means of arriving at lawful—'just and reasonable'—rates under the act. Unless it is continued to be used at least as a point of departure, the whole experience under the act is discarded and no anchor, as it

were, is available by which to hold the terms 'just and reasonable' to some recognizable meaning.''

The Public Service Commission of the State of Wisconsin attempted at one time to depart from the long established rate base method in fixing the return allowable to the Commonwealth Telephone Company. The Commission's order was appealed to the Circuit Court of Dane County, Wisconsin, 71 P. U. R. 65. The Circuit Court posed the question by saying the Commission ''failed to make any finding of fact at all and particularly failed and, indeed, emphatically *refused* to find a *rate base.''* Some of the language used by the Circuit Court in reversing the Commission is we think interesting, and also applicable to the question under consideration by us. Some pertinent quotes are: ''. . . for the regulatory Commission to repudiate the necessity of finding the 'fair value' of the utility's property, *or some other base,* is to us unprecedented in forty years of administrative regulation . . .'' ''The Commission throws out a half century of rate making as recognized in the forty-eight states and by the Federal Government — and announces that the rates are not based on any rate base,'' and; ''The Commission finds *nothing except* that a certain amount of dollars represents a reasonable profit.'' Then the Circuit Court, in commenting on the last quoted statement said: ''Reasonable profit ON WHAT? That is the trouble with the Commission's decision. It has no bottom. It has a numerator but no denominator.'' ''The point is that there is, and always has been, a BASE in the fixing of public utility rates. That is where the decision of the Public Service Commission of Wisconsin, now under review, is unique in the decades of rate making. There is no base found or even faintly suggested in the Commission's decision.''

We realize of course that only limited weight can be given to a decision of the Wisconsin Circuit Court, but that fact does not detract from the force of the reasoning if it is sound, and we think it is. In addition, this

Circuit Court's holding was reviewed and affirmed by the Supreme Court of Wisconsin in *Commonwealth Telephone Co.* v. *Public Service Commission,* 252 Wis. 481, 32 N. W. 2d 247. There the Supreme Court, after reviewing the findings of the Commission, said: "It was not the intention of the legislature to bestow such arbitrary powers upon the Commission, and nothing in the statute can be so construed." Also the Court after stating that the Commission must make specific findings of the "relevant facts and circumstances" to determine whether a return is proper or not, said: "The Commission must determine what those are and set them forth as required by law. Those essential facts which control each case will then determine the *rate base"* (emphasis supplied). The decision in the *Commonwealth* case, *supra,* was cited with approval in *New England Telephone & Telegraph Co.* v. *State, et al.,* 95 N. H. 353, 64 A. 2d 9, at page 14; *New England Tel. & Tel. Co.* v. *Kennelly,* 80 R. I. 436, 98 A. 2d 835 at page 838, and; In Re *Petition of New England Tel. & Tel. Co.,* 115 Vt. 494, 66 A. 2d 135, at page 140. In the last cited case the court (on page 138), after stating that the usual method of fixing rates was to determine a proper rate base and the allowable expenses, made this statement:

"Whether the method adopted in fixing rates follows the one just suggested in the order of the steps taken is immaterial. It is apparent, and it is shown by all the cases which we have read touching on this point, that in order to reach a fair judgment of rates to be fixed, it is *necessary* that a *proper rate base* and allowable expenses be determined." (emphasis supplied)

Even though the Company and the Commission acknowledge that the fair field price method is relatively new and untried, they point to the fact that the Federal Power Commission (Re *Panhandle Eastern Pipe Line Company,* 3 P. U. R. 3d 396) and the U. S. Circuit Court of Appeals, District Court of Columbia, 230 F. 2d 810, held that it was not an unlawful method of rate fixing under the provisions of the National Gas Act,

52 Stats. 822 (1938) 15 U. S. C. A. § 717 *et seq.* There are however good reasons, we think, why the above decisions are not applicable to, and certainly not binding, in the matter here considered. *First,* in the *Panhandle* case the party seeking an additional return is an independent pipeline company, while here the Company is a public utility, operating under an exclusive franchise. *Second,* the relationship of the parties is not the same. As we have heretofore pointed out, the Company in this case bears a trust like relationship to its customers and the general public, but this is not the situation in the case of an independent pipe line company. *Third,* the two situations are not governed by the same statutory provisions. In the *Panhandle* case the Federal Power Commission operating under the provisions of the Natural Gas Act, above, was under no obligation "to fix rates at the lowest level of reasonableness" . . . but only "to protect consumers against exploitation at the hands of natural gas companies" (*City of Detroit, supra*). In the case of a public utility however, the situation is not the same. Not only does the spirit of the regulatory statutes require the lowest possible rate commensurate with fair and reasonable return to the stockholders, but Ark. Stats. § 73-1901 makes it plain that: "All gas lines or companies operating within the State who render a domestic or general service to the public in furnishing and sale of gas are hereby required to buy or furnish from the lowest or most advantageous market."

The Company has introduced into the record a mass of expert testimony to show (and appellants have done the same to refute) that the very nature of the gas production business makes the base rate an outmoded and impractical method. The Company presents able arguments and pertinent testimony and citations to sustain their contention, but because we have concluded the Commission has no authority, without additional legislation, to abandon the rate base method, it would serve no useful purpose and would unduly extend this opinion to consider the case from that standpoint.

*Other Issues.* Since our determination of the principal question above calls for a remand it is necessary, for the Commission's guidance, to consider four other questions raised by appellants.

1. *Rate of Return.* After applying the fair field price method and after separating the Company's gas production properties from the rate base, the Commission fixed 8% (or more) as a fair rate of return on gas sold to 3-B customers. The acceptance of this figure was perhaps influenced by the testimony of Eugene S. Merrill. However, as fully recognized by the Commission, Mr. Merrill did not purport to say what a fair per cent of return would be on an overall basis. On the other hand Dr. Lionel W. Thatcher, whom the Commission described as "eminently qualified," and he alone, made a study of a proper overall return, and he recommended 6.34 per cent. We have given careful consideration to this matter and it is our best judgment that the Commission should adopt 6.34 per cent as being the proper return for the company, since we find no substantial evidence to support a higher rate. Incidentally it is a higher rate of return than this court has heretofore approved for a public utility company.

2. *Allocation of Transmission Costs.* In a rate proceeding such as this it is necessary for the Commission to allocate or apportion the joint costs of transmitting gas from the well to the customers according to each class of customer's responsibility therefor. Generally speaking there seem to be two methods of making this allocation or at least two elements which deserve consideration. One is based on the peak capacity required by each class of customer, and the other is based on the actual consumption of each class over a stated period of time. Appellants say the former method is preferable, and would result in a saving to them. The Commission, however, chose to allocate 50% of the constant cost of transmission to coincidental peak use and 50% to the annual volume used. It appears to us that this is a matter that cannot be determined to a mathe-

matical certainty but must be left to the determination of the Commission, based on substantial evidence in the record. We find such evidence in this record. Where the same question was under consideration, in *Colorado Interstate Gas Co.* v. *Federal Power Commission*, 324 U. S. 581, 65 S. Ct. 829, 89 L. Ed. 1206, it was said: ''Allocation of costs is not a matter for the slide rule. It involves judgment on a myriad of facts. It has no claim to an exact science.''

3. *Account* 100.5. Several years ago the Company (or its predecessor) in acquiring certain distribution, transmission and production properties, paid approximately $5,000,000 in excess of the original costs. The Company now carries in account 100.5, called Gas Plant Acquisition Adjustment — $3,013,468.58, representing the unamortized portion of the $5,000,000 existing on December 31, 1954 (1954 being the test year on which this hearing was based). Appellants introduced testimony to show that the Company had recouped the questioned amount through earnings in excess of 6% per annum (allowed by the Commission) over a period of years. It appears from the record however that there is substantial evidence to support the Commission in finding (as it did find) (a) that the purchase of the aforementioned properties by the Company was made at arms length dealing, (b) that substantial amounts of the Company's earnings had come from non-utility property, and (c) that the amount of $3,013,468.58 should be included in the Company's rate base in this case.

4. *Working Capital.* We do not agree with appellants in their contention that the Commission acted arbitrarily in determining the Company Working Capital allowance, which of course is included in the rate base. It is conceded by appellants that the Company is entitled to set aside some considerable amount, called working capital (estimated at $4,000,000) to buy material and supplies, and to pay day-to-day operating expenses. It is conceded by both sides that the Company collects from its customers (through established

rates) large amounts with which to pay income taxes. Much of this, of course, is collected in advance of disbursement. Appellants show that approximately 70% of these tax accruals would be available in cash at all times to the Company, and therefore, say appellants, this amount should be deducted from the Company's working capital requirements. The Commission however, ordered the Company's working capital decreased by only 50% of the total tax accruals instead of 70% as urged by appellants. This, again, is a matter which we think, addresses itself to the sound judgment of the Commission based on substantial evidence. It seems reasonable that the Commission had a right to consider factors other than the percentage of advance tax collections in arriving at a proper allowance. The Commission states that in a former case its staff developed information from which it determined that a 50% allowance was fair. We are in no position to question the same finding here because, in the absence of proof to the contrary, we must assume that the percentage of advance tax allocation was the same in both instances.

This court has not, of course, made any attempt to determine whether the disposition we have made of this case calls for any refund to be made by appellants on their bonds. This will be done by the Commission after a redetermination of the whole matter in accordance with the views herein expressed.

This cause is therefore reversed and remanded to the trial court with instructions to remand to the Commission for further action consistent with the holdings in this opinion.

The *United States of America,* as a large consumer of gas furnished by the Company, was also a remonstrant before the Commission and an appellant to the Circuit Court. It has attempted to lodge an appeal in this court from the decision of the Circuit Court, under appeal docket number 1201, and has been granted the right to use the record in appeal number 1144.

However appellees point out that the United States has not perfected its appeal to this court within the 60 days provided for by Ark. Stats. § 73-236(a). The United States, conceding the above, relies on the fact that it has perfected its appeal within the time provided by Act 555 of 1953. This poses the question of whether said Act 555 supersedes § 73-236(a), and we think it must be answered in the negative.

In the first place a casual reading of Act 555 shows that it was not meant to apply to this kind of a case where the Circuit Court reviews the record made before the Commission. In taking an appeal under Act 555, Section 8 provides for the designation of all or part of the evidence, and Section 19 outlines the procedure where there is no stenographic report of the testimony. None of these provisions would be applicable to the taking of an appeal of this nature.

In addition, we point out that Act 555 does not specifically repeal Ark. Stats. § 73-236(a), which is a special law providing for special appeals. Nor does Act 555, which is a general law, repeal by implication the special law. This court, in *Faver* v. *Golden, Judge,* 216 Ark. 792, 227 S. W. 2d 453, in deciding whether a general election law repealed specific provisions for the contest of the election of a school director, said: "We have held that a general law does not apply where there is another statute governing the particular subject, irrespective of the dates of their passage." See also *Johnson* v. *Darnell,* 220 Ark. 625, 249 S. W. 2d 5, at page 628 of the Arkansas Reports.

It follows therefore that the appeal of case number 1201 must be dismissed.