2012 Ark. App. 264

**ARKANSAS ELECTRIC ENERGY CONSUMERS, INC., and Arkansas Gas Consumers, Inc., Appellants**

v.

**ARKANSAS PUBLIC SERVICE COMMISSION; Entergy Arkansas, Inc.; Centerpoint Energy Resources Corp.; and Audubon Arkansas, a Division of the National Audubon Society, Inc., Appellees.**

No. CA 11–496.

Court of Appeals of Arkansas.

April 18, 2012.

Rehearing Denied May 30, 2012.

H. Edward Skinner, Wright, Berry, Moore & White, P.A., Arkadelphia, Attorneys for Appellants.

Eric G. Hughes, Hughes & Hughes Law Firm, Arkadelphia, Attorney for Appellee, Audubon Arkansas.

Derrick W. Smith, Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C., Little Rock, and Kenny Henderson, Stephanie Elmore, CenterPoint Energy Resources Corp., Little Rock, Attorneys for Appellee.

JOHN B. ROBBINS, Judge.

As part of a larger effort to establish energy-efficiency policies and requirements for Arkansas utilities, the Arkansas Public Service Commission opened Docket No. 08–137–U to consider innovative approaches to utility regulation necessitated by the shift toward energy conservation. In doing so, the Commission issued Orders 15 and 18, which approved a general policy to award incentives to utilities for their achievement in delivering essential energy-conservation services. The Commission also established specific goals to be used as standards for awarding or not awarding the incentives during the 2011–13 program years. Appellants Arkansas Electric Energy Consumers, Inc., and Arkansas Gas Consumers, Inc., appeal from Orders 15 and 18, arguing that the incentives were not authorized by law and constituted an improper abandonment of traditional rate-making practices. We affirm the Commission's orders.

To place the Commission's ruling in context, we begin with the passage of the Energy Conservation Endorsement Act (ECEA) almost thirty-five years ago during the oil crisis of the 1970s. *See* Act 748 of 1977, codified at Ark.Code Ann. §§ 23–3–401 to –405 (Repl.2002). The ECEA declared that the United States was confronted with a "severe and very real" energy crisis; that the demand for fuels was outstripping supplies; that enormous amounts of energy were being wasted due to inadequate insulation and other inefficiencies; and that the President of the United States had established energy conservation as a high-priority national goal. Ark.Code Ann. § 23–3–402. In light of these considerations, our General Assembly determined that a "proper and essential function" of regulated utilities was to engage in energy-conservation programs, projects, and practices. Ark.Code Ann. § 23–3–404. The ECEA defined "energy conservation and program measures" as including, but not limited to, insulation programs; programs that improved load

factors and contributed to reductions in peak power demands; and programs that encouraged the use of renewable energy technologies or sources. Ark.Code Ann. § 23–3–403.

In section 405, the ECEA established the authority of the Public Service Commission to "propose, develop, solicit, approve, require, implement, and monitor" energy-conservation measures that caused utility companies to incur "costs of service and investments." Ark.Code Ann. § 23–3–405(a)(1). The Commission was granted the power to approve such programs and measures, following proper notice and hearings, and to order them into effect if it determined that they would be "beneficial to the ratepayers of such public utilities and to the utilities themselves." Ark.Code Ann. § 23–3–405(a)(2). In those instances, the Commission was required to declare that the costs of such conservation measures were proper costs of providing utility service. Further, once the programs or measures were approved or ordered into effect, the Commission was required to

> order that the affected public utility company *be allowed to increase its rates or charges as necessary to recover any costs incurred by the public utility company* as a result of its engaging in any such program or measure.

Ark.Code Ann. § 23–3–405(a)(3) (emphasis added). The italicized portion of the statute is a primary point of controversy in this appeal, as is the following, final provision of the ECEA:

> Nothing in this subchapter shall be construed as limiting or cutting down the authority of the commission to order, require, promote, or engage in other energy conserving actions or measures.

Ark.Code Ann. § 23–3–405(b).

For reasons best left explained by history, the ECEA did not spark a large, con-certed effort toward energy-conservation programs in the decades that followed, either by the utilities or the Public Service Commission. Between 2006 and 2008, however, the utility-regulatory field in Arkansas saw a significant increase in energy-conservation activity, whereby the Commission not only ordered utilities to implement energy-efficiency programs but developed rules that required utilities to submit their programs for approval and explain the anticipated benefits. The Commission also opened numerous dockets to address and explore energy efficiency in all areas of utility use. Included among those dockets was No. 08–137–U, which was styled "In the Matter of the Consideration of Innovative Approaches to Ratebase Rate of Return Ratemaking Including, But Not Limited To, Annual Earnings Reviews, Formula Rates, and Incentive Rates for Jurisdictional Electric and Natural Gas Utilities." In its first order in Docket 08–137–U, the Commission noted the following:

> [W]ithin the national public utility regulatory dialogue there is a growing level of references to and discussion of shifting regulatory paradigms which may necessitate innovative approaches to the traditional ratebase rate of return regulation which for decades has governed the setting of revenues and rates for electric and gas public utilities.

More specifically, the Commission recognized that the increased emphasis on energy efficiency would decrease usage by consumers and could compromise revenue recovery by the utilities. The Commission therefore invited input regarding these concerns from its staff; from the Attorney General; from public utilities; and from appellants.[1]

1. Numerous other entities also offered com-

ments and testimony, including Audubon Ar-

The vast majority of those that filed testimony and comments agreed that the current regulatory framework did not promote energy efficiency and that implementation of energy-efficiency programs warranted adjustments to the traditional ratemaking process. Witnesses explained that a utility is an investor-owned business and entitled to a financial return for its shareholders. They observed that this return, combined with a utility's general cost of doing business, ordinarily formed the basis for establishing consumer rates under traditional rate base/rate of return regulation. They stated, however, that the traditional ratemaking paradigm emphasized increased consumer usage and increased utility investment in physical plant (generation, transmission, and distribution) as means of producing revenue for the utility and providing a basis for investors to receive a return. Energy-conservation measures, they said, upset this paradigm by decreasing consumer usage and decreasing the need for investment in physical plant, thereby reducing the utility's ability to recover its fixed costs and provide a return to its shareholders.

Based on these observations, several parties proposed that three mechanisms were necessary for a beneficial energy-efficiency program: 1) recovery of the program costs incurred by the utility in implementing energy-efficiency measures; 2) recovery of the utilities' lost contribution to fixed costs (LCFC) occasioned by the drop in consumer revenue; and 3) financial incentives paid to the utility in order to either provide a return to shareholders or to promote exemplary performance of conservation programs. Among those recommending or acceding to at least some level of incentives were the electric and gas utilities; the Attorney General; the Federal Executive Agencies; Audubon Arkansas; and the Commission staff. The staff cautioned, however, that incentives should be awarded only in those instances where the utility could demonstrate that its programs met or exceeded performance goals set by the Commission.

By the time of the final hearing, the Commission had approved a bill rider that allowed utilities to recover their program costs and LCFC. Those charges are not at issue on appeal. The need and methodology for incentives, however, continued to be debated. Several witnesses testified that, because energy-efficiency programs cause utility shareholders to forego the traditional means of earning a return on investment, some type of incentive is necessary to promote meaningful performance and to motivate utilities to reject their usual patterns of usage and plant acquisition as a means of generating a return. There was also testimony that incentive plans in which utilities and consumers share the savings engendered by energy conservation programs constitute "good public policy" and serve to align utility and consumer interests, being beneficial to both. The evidence further reflected that the National Action Plan for Energy Efficiency and the National Association of Regulatory Utility Commissioners supported the use of incentives and that several states had crafted incentive plans, with some going so far as to impose penalties on the utilities for failing to meet specified energy-savings goals.

Appellants opposed the use of incentives, arguing that the Commission did not have the authority under the ECEA to award them. Appellants relied on that portion of the Act that allows a utility to recover its "costs" resulting from a conservation program. Ark.Code Ann. § 23-3-405(a)(3). Appellants contended that incentives could not be defined as costs.

kansas, an appellee in this case.

In Order No. 15, the Commission determined that it possessed the authority under both the ECEA and general ratemaking statutes to award incentives.[2] The Commission declared that the ECEA allowed utilities to recover "any costs" resulting from conservation programs, a broad term that included incentives. It also ruled that incentives were necessary to meet the statutory mandate in Arkansas Code Annotated section 23–3–405(a)(2) that energy-conservation programs must benefit both consumers and the utility. Further, the Commission noted that Arkansas Code Annotated section 23–3–405(b), which provides that |₇"nothing in this subchapter shall be construed as limiting or cutting down the authority of the commission to order, require, promote, or engage in other energy conserving actions or measures," permitted the award of incentives.[3] The Commission therefore approved a general policy to grant incentives to utilities "to reward achievement in the delivery of essential energy conservation services."

As proposed, the incentives covered years 2011–13 but would not be awarded contemporaneously during the efficiency program year. Rather, they would be awarded, if at all, only "after the fact" based on a "robust" evaluation, measurement, and verification analysis. As for calculation of the incentive amounts, the Commission adopted a "shared savings of net benefits" approach in which projected benefits to ratepayers and to each utility would be computed in terms of "avoided costs," and the costs of the programs themselves would then be deducted to yield net benefits. The net benefits, if any, would thereafter be shared by the consumers and the utility, with the consumer receiving at least ninety percent of the benefits and the utility receiving a maximum of ten percent. The utility, however, was entitled to no benefits at all unless it achieved eighty percent or more of the specific savings goals established by the Commission.[4] The Commission declined to impose a penalty on those |₈utilities that did not meet the savings goals but reserved the right to revisit that question at a later time.

Appellants filed a timely petition for rehearing from Order No. 15, pursuant to Arkansas Code Annotated section 23–2–423(a)(2) (Repl.2002). They reiterated that the Commission lacked the statutory authority to award incentives, and additionally argued that an award of incentives constituted abandonment of traditional ratemaking practices. The Commission rejected appellants' arguments in Order No. 18, which led to this appeal.

### I. Commission's Statutory Authority to Award Incentives

■ Appellants argue first that the ECEA does not clothe the Commission

---

**2.** The general statutes cited by the Commission included Arkansas Code Annotated sections 23–2–301 to –305 (Repl.2002).

**3.** The Commission also cited 16 U.S.C. § 2621(d)(8) (2011), which provides that electric utility rates shall be such that the investment in conservation and demand-side management are at least as profitable, giving consideration to income lost, as investments in new generation, transmission, and distribution equipment.

**4.** The goals were tied to levels of energy sales in 2010. For example, each electric utility's goal was to achieve savings in 2011 equal to .25 percent of 2010 sales; savings in 2012 equal to .50 percent of 2010 sales; and savings in 2013 equal to .75 percent of 2010 sales. The Commission's order does not make clear how the utility is to receive its share of benefits from the consumer, if those benefits are in fact earned. Presumably, a sharing mechanism would be effected through either recalculation of rates or by a rider.

with the authority to award incentives to a utility for implementing energy-efficiency programs. They contend that Arkansas Code Annotated section 23–3–405(a)(3) provides only for a utility's recovery of "costs," which they interpret to mean the actual, out-of-pocket expenses incurred by the utility relative to its energy-efficiency programs. Appellees respond that incentives fall within the meaning of that phrase "any costs" as used in section 405(a)(3) because incentives operate as a substitute for the return on investment that shareholders traditionally receive, which is considered a cost of service. *See generally Entergy Ark. v. Ark. Pub. Serv. Comm'n,* 104 Ark.App. 147, 289 S.W.3d 513 (2008); 26 C.F.R. 1.46–6(b)(2) (2009). Appellees also argue that incentives represent the "opportunity cost" of the utilities' forgone investment in physical plants, which has historically yielded a return to shareholders. *See Verizon Commc'ns, Inc. v. Fed. Commc'ns Comm'n,* 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); *Cartersville Elevator, Inc. v. Interstate Commerce* |₉*Comm'n,* 724 F.2d 668 (8th Cir. 1984) (defining opportunity cost).

█ We note at the outset that appellants do not argue that the Commission lacked substantial evidence to award incentives. Rather, their challenge is to the Commission's legal authority. The issue before us is therefore one of law. Accordingly, we do not pass on the wisdom of the Commission's actions or declare whether the Commission has appropriately exercised its discretion. *See Ark. Gas Consumers, Inc. v. Ark. Pub. Serv. Comm'n,* 354 Ark. 37, 118 S.W.3d 109 (2003). We need only determine whether the Commission possessed the authority to award incentives based on our de novo interpretation of the applicable statute. *See Scoggins v. Medlock,* 2011 Ark. 194, 381 S.W.3d 781. In doing so, we observe that the interpretation of a statute by the agency charged with its execution is highly persuasive, and, while not binding on this court, will not be overturned unless it is clearly wrong. *Sw. Bell Tel. Co. v. Ark. Pub. Serv. Comm'n,* 69 Ark.App. 323, 13 S.W.3d 197 (2000).

That being said, our basic rule of statutory interpretation is to give effect to the intent of the legislature, construing the statute just as it reads, giving the words their ordinary and usually accepted meanings in common language. *Sykes v. Williams,* 373 Ark. 236, 283 S.W.3d 209 (2008). Further, we read statutes as a whole to determine their meaning. *Nash v. Am. Nat'l Prop. & Cas. Co.,* 98 Ark.App. 258, 254 S.W.3d 758 (2007).

█ Upon viewing the ECEA in its entirety, we conclude that the question of whether incentives are recoverable as "costs" under section 23–3–405(a)(3) need not be reached. Instead, we look to section 23–3–405(b), which provides that nothing in the subchapter—a phrase that includes the Commission's authority to award costs—shall be construed as limiting |₁₀the authority of the Commission to, among other things, promote or engage in other energy conserving acts or measures. Keeping in mind that statutes pertaining to utility regulation must be strictly construed, *see Hempstead Cnty. Hunting Club, Inc. v. Ark. Pub. Serv. Comm'n,* 2010 Ark. 221, 384 S.W.3d 477, the intent of subsection 405(b) could not be clearer. The statutory scheme ensures that the utilities recover the costs they incur in engaging in conservation programs; but, given the language of section 405(b), the "cost" provision is not intended as a limitation on the Commission's ability to pursue other means of promoting energy efficiency. The incentives in this case were approved by the Commission in large part to promote the utilities' pursuit of energy

conservation. We acknowledge that the ECEA does not expressly mention the Commission's authority to award incentives. But, even in 1977, there would have been an obvious impracticability in attempting to create an exhaustive list of devices that the Commission might employ to carry out its energy-conservation duties. The legislature obviously foresaw that the Commission would need some measure of flexibility to meet energy-conservation challenges not only in the reduced-supply years of the 1970s but in whatever conservation needs might arise in the future. Thus, the passage of section 405(b).

We therefore affirm the Commission's authority to award incentives under the ECEA. Our holding makes it unnecessary to address whether the Commission's authority arose from the general ratemaking statutes.

## II. *Abandonment of Traditional Ratemaking Practices*

■ Appellants' final argument is that the Commission's use of incentives amounted to an abandonment of traditional ratemaking practices. By "traditional," appellants mean the method by which the utilities' rates are set, during a rate case, based on their costs and the rate of return applied to their rate base.

■■ The Commission has broad discretion in choosing an approach to rate regulation and is free, within its statutory authority, to make any reasonable or pragmatic adjustments that may be called for under particular circumstances. *See Sw. Bell Tel. Co. v. Ark. Pub. Serv. Comm'n,* 267 Ark. 550, 593 S.W.2d 434 (1980); *Ark. Power & Light v. Ark. Pub. Serv. Comm'n,* 226 Ark. 225, 289 S.W.2d 668 (1956); *Sw. Bell Tel. Co. v. Ark. Pub. Serv. Comm'n,* 58 Ark.App. 145, 946 S.W.2d 730 (1997); *Bryant v. Ark. Pub. Serv. Comm'n,* 46 Ark.App. 88, 877 S.W.2d 594

(1994); *Walnut Hill Tel. Co. v. Ark. Pub. Serv. Comm'n,* 17 Ark.App. 259, 709 S.W.2d 96 (1986). Our courts are not generally concerned with the method used by the Commission to establish components of rate regulation. *Gen. Tel. Co. of the Sw. v. Ark. Pub. Serv. Comm'n,* 295 Ark. 595, 751 S.W.2d 1 (1988). Accordingly, our supreme court recognized in *General Telephone* that the only exception to this general rule appears in *Acme Brick v. Arkansas Public Service Commission,* 227 Ark. 436, 299 S.W.2d 208 (1957), the case on which appellants rely for reversal.

*Acme Brick* involved an extreme situation in which, during a rate case, the Commission removed $10,000,000 worth of a gas company's production assets from its rate base and attempted to calculate rates by a method wholly unrelated to the rate base/rate of return method. The supreme court rejected the Commission's action, noting that the Commission had 1) removed the utility's production facilities from the Commission's jurisdiction; 2) violated the idea that a public utility's production assets are held in trust for the public; 3) made shareholders' use of the assets immune from accounting; and 4) made the shareholders the primary, if not only, beneficiaries of its action. Appellants argue that, just as in *Acme Brick,* the Commission in this case has abandoned traditional ratemaking practices. They claim that this occurred when the Commission permitted the utilities to earn incentives and obtain a "windfall" in a proceeding conducted outside the ratemaking process.

There is no doubt that the Commission undertook a new direction in this case, as evidenced by the purpose of this docket, which was to explore innovative ratemaking. The Commission's use of incentives, however, is more in the nature of a pragmatic adjustment, necessitated by the practical considerations of requiring utili-

ties to pursue energy conservation. No assets were removed from the rate base, as in *Acme Brick,* and the Commission emphasized that the rate base/rate of return method is still the practice in Arkansas. Further, the ECEA, which was enacted after *Acme Brick,* contemplates the award of costs to the utilities at the time a program is approved, indicating that Commission regulation of conservation programs may take place outside of a rate case.

As for appellants' concern that incentives lead to a windfall and over-earning by the utilities, we note that the utilities are awarded incentives only if they save costs and achieve extraordinary performance in those savings. At that point, they receive a small percentage of those savings with consumers retaining the remainder. Thus, the benefits are not confined solely to the shareholders, as occurred in *Acme Brick.* Further, the Commission expressly stated that incentives would be awarded only after a "robust" review conducted by the Commission. Unlike the situation in *Acme Brick,* the Commission has maintained scrutiny over the utilities' earnings.

Based on the foregoing, we affirm Commission Orders 15 and 18 in Docket 08–137–U.

Affirmed.

VAUGHT, C.J., and PITTMAN, WYNNE, and ABRAMSON, JJ., agree.

HART, J., dissents.

HART, J., dissenting.

In 2005, the General Assembly, in an apparent effort to spur conservation efforts, ordered the Public Service Commission (PSC) to prepare a report for the General Assembly concerning its activities under the Energy Conservation Endorsement Act of 1977 (ECEA). 2005 Ark. Act 1939. Specifically, the General Assembly asked for "[a]ny recommendations" that the PSC "may want to offer for the General Assembly's consideration." *Id.* Without specific authority enacted by the General Assembly, the PSC created its own conservation program that offers incentives to public utilities.

The crux of this appeal is whether the General Assembly, by enacting the ECEA, bestowed upon the PSC the authority to award "incentives" to utilities to replace lost sales. The ECEA specifically permits the PSC to "order that the affected public utility company be allowed to increase its rates or charges as necessary to recover any costs incurred by the public utility company." Ark.Code Ann. § 23–3–405(a)(3) (Repl.2002). The appellees reason that incentives could be awarded because this statute allows for recovery of "costs." The premise is that "costs" include "incentives" that substitute for a return on investments, or even a return on foregone investments, and thus incentives are considered a "cost of service."

This rationale is unconvincing. The provision relied on by the appellees permits recovery of costs *incurred.* The ECEA further discusses "measures by utility companies which cause the companies to *incur* costs of service and investments which conserve, as well as distribute, electrical energy and existing supplies of natural gas, oil, and other fuels." Ark.Code Ann. § 23–3–405(a)(1) (emphasis added). Thus, the ECEA speaks in terms of costs *incurred,* not a return on investments or a return on foregone investments. Moreover, those costs incurred must be associated with costs that conserve and distribute. Again, the ECEA does not speak in terms of a return.

As admitted by the PSC during oral arguments, "incentives" cause an increase in rates. The General Assembly has en-

acted an entire body of statutory law on ratemaking. In that body of law, the General Assembly interposed numerous safeguards to protect the consumer, including notice, investigation, and test periods for determining the reasonableness of proposed new rate schedules. When a public utility seeks a rate increase, it must pursue that rate increase through the General Assembly's statutes on ratemaking, with all the attendant safeguards provided in those ratemaking statutes. In obtaining a rate increase through the ECEA, the PSC has permitted public utilities to circumvent the General Assembly's ratemaking statutes.

The rationale adopted by the majority is equally unconvincing. The majority does not make the mistake of asserting that costs include a rate of return. The majority instead relies on a separate provision of the Act, which provides that "[n]othing in this subchapter shall be construed as limiting or cutting down the authority of the commission to order, require, promote, or engage in other energy conserving actions or measures." Ark.Code Ann. § 23–3–405(b). While the majority correctly acknowledges that the Act "does not expressly mention the Commission's authority to award incentives," it nevertheless asserts that the intent behind this subsection "could not be clearer" and treats incentives as other means of promoting energy efficiency.

I disagree with the majority's assertion. This subsection does not grant additional authority to the PSC. Instead, it merely establishes that the ECEA does not reduce authority granted by other legislative acts. For instance, if the PSC sought, through its statutory ratemaking procedures, to promote conservation, the ECEA, by its own terms, would not be seen as a limitation on the PSC's authority to pursue this course. The majority, however, treats this limitation as a separate grant of authority.

The dangers associated with the majority's interpretation are readily apparent. If this statutory provision is treated as a separate grant of authority to the PSC to award incentives, it is a grant of authority bereft of the attendant safeguards seen in the General Assembly's ratemaking statutes or those in the ECEA concerning recovery of costs incurred. Without limitations on the grant of authority, the PSC's authority is limited only by the consciences of the Commissioners; in awarding incentives, the PSC could quite simply act arbitrarily, unreasonably, and without notice.

The Arkansas Supreme Court has held that the PSC is a creature of the General Assembly, and its power and authority is limited to that which the General Assembly confers upon it. *Ark. Gas Consumers, Inc. v. Ark. Pub. Serv. Comm'n*, 354 Ark. 37, 118 S.W.3d 109 (2003). Statutes pertaining to utility regulation must be strictly construed, and nothing may be taken that is not clearly expressed. *Hempstead Cnty. Hunting Club, Inc. v. Ark. Pub. Serv. Comm'n*, 2010 Ark. 221, 384 S.W.3d 477. Neither the PSC nor the majority has adhered to this precedent. Thus, I respectfully dissent.