2012 Ark. App. 673

**ST. EDWARD MERCY MEDICAL CENTER & Sisters of Mercy Health System, Appellants**

v.

**Jimmie HOWARD, Appellee.**

**No. CA 12–546.**

Court of Appeals of Arkansas.

Nov. 28, 2012.

Anderson, Murphy & Hopkins, LLP, Little Rock, by: Randy P. Murphy and Kyle E. Burton, for appellants.

Walker, Shock & Harp, PLLC, Fort Smith, by: Eddie H. Walker, Jr., for appellee.

DAVID M. GLOVER, Judge.

St. Edward Mercy Medical Center and its carrier, Sister of Mercy Health System, appeal from the Workers' Compensation Commission's decision, which found that Jimmie Howard was entitled to additional medical services related to his admittedly compensable work injury and temporary-total disability benefits from November 16, 2010, through February 7, 2011, without any off-set for vacation pay. We affirm.

### Background

The basic facts of this case are essentially undisputed, were set forth by the Administrative Law Judge, and were adopted by the Commission. Jimmie Howard began working for St. Edward Mercy Medical Center in May 2000. On August 18, 2010, he sustained an admittedly compensable injury while lifting a work table, experiencing low-back pain that radiated down his left leg. There was no dispute about the medical services provided to him through November 15, 2010. Instead, the dispute arose over surgery performed by Dr. Jorge Alvernia on November 16, 2010, and temporary-total disability benefits for the period November 16, 2010, to February 7, 2011, when Howard returned to work.

Howard testified that he suffered a great deal of pain in his lower back and legs from the time of the work injury until the surgical intervention. He attributed his condition resulting in surgery to his work accident because he never had a problem before then. He was off work for ten weeks following the surgery, during which time he drew the amount of his salary in vacation benefits, and his medical bills were paid by his regular health insurance.

The ALJ summarized the medical evidence as follows:

Dr. Nowlin's review of x-rays dated August 30, 2010, reveal that the claimant had.

Grade I spondylolisthesis at L5–S1. Bulging of uncovered disc into the left exit foraman producing a moderate foraminal stenosis at this level. On the right side, there is a severe foraminal stenosis at L5–S1 related spur formation. 1 his may potentially compromise the exiting right L5 root.

The claimant was then referred to Dr. Alvernia, and seen on September 15, 2010. Dr. Alvernia noted the claimant's pain and recommended treatment with medicine and a brace for six weeks. Dr. Alvernia noted the claimant's continued pain on October 13, 2010. A CT of the lumbar spine revealed.

1. Bilateral spondylolisthesis, grade 1 spondylolisthesis L5 on S1.

2. There is an uncovered disc at L5–S1 secondary to spondylolisthesis. There is a right lateral neural foraminal spur and disc bulge at L5–S1 and there is a left lateral broad-based bulge of disc narrowing the left neural foramen at L5–S1.

3. Left renal calcification incidently noted, probably small renal calculus.

The CT report also revealed that the CT findings were "similar or perhaps more

pronounced than on prior MRI 8/30/10." Dr. Alvernia noted in his report of November 3, 2010 that "on lumbar CT and MRI presence or L5 S1 spondylolisthesis with associated bilateral pars interarticularis defect." The doctor notes, at this point, he discussed treatment options with the claimant and the claimant decided to proceed with surgery.

Additionally, on November 11, 2010, Dr. Alvernia in response to written questions from the workers' compensation insurance provider listed the following:

1. Bilateral spondylolisthesis L5–S1 is the origin of his symptoms.
 — Bilateral S1 radiculopathy.
 — Back pain.
 — Neurological claudication.
2. The origin of his spondylolisthesis is a combination of degenerative process with trauma at some point.
3. Way to fix: the spondylolisthesis is through surgery.

The claimant had surgery on November 16, 2010. Dr. Alvernia's notes regarding his follow up with the claimant, consistently reveal the claimant is "doing great" with no back pain.

In preparation for the hearing on October 18, 2011, the deposition of Dr. Alvernia was taken. He testified that, because of the radiation of the pain and the severity of the pain and associated findings on a lumbar MRI, he made a diagnosis of "L5–S1 was disc herniation, was degenerative spondylolisthesis on grade one." He added that [it] is hard to tell if spondylolisthesis is induced from trauma or a degenerative condition, but that it could be aggravated by lifting a heavy object. He added that the claimant had an underlying degenerative condition in his back but that he would not have recommended surgery if the condition had not become symptomatic. He continued that the symptoms caused the need for surgery and that the job related accident contributed to the need for surgery. The doctor also testified that he considered the recommended surgery reasonably necessary from a medical standpoint. Dr. Alvernia confirmed that the claimant returned to work on February 7, 2011, after being off work for surgery and recovery for ten weeks. He added that he considered ten weeks a reasonable amount of time to be off work, considering the kind of surgery that the claimant had received.

(Record & exhibit citations omitted.)

### Standard of Review

We review a decision of the Workers' Compensation Commission to determine whether there is substantial evidence to support it. *Crosby v. Eaton Corp.*, 2012 Ark. App. 565, 2012 WL 4831821. We review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings. *Id.* It is the Commission's province to weigh the evidence and determine what is most credible. *Id.* The Commission is the ultimate arbiter of weight and credibility. *Towler v. Tyson Poultry, Inc.*, 2012 Ark. App. 546, 423 S.W.3d 664. The issue on appeal is not whether we would have reached a different result or whether the evidence would have supported a contrary conclusion, we will affirm if reasonable minds could reach the Commission's conclusion. *Crosby, supra.*

The question of the correct interpretation and application of an Arkansas statute is a question of law, which we decide de novo. *Stewart v. Arkansas Glass Container*, 2010 Ark. 198, 366 S.W.3d 358. It is for this court to decide what a statute means. *Id.* In deciding what a statute means, the interpretation

of a statute by the agency charged with its execution is highly persuasive, and, while not binding on this court, will not be overturned unless it is clearly wrong. *Arkansas Elec. Energy Consumers, Inc. v. Arkansas Pub. Serv. Comm'n,* 2012 Ark. App. 264, 410 S.W.3d 47. When we construe the workers' compensation statutes, we must strictly construe them. *Stewart, supra.* Strict construction is narrow construction and requires that nothing be taken as intended that is not clearly expressed. *Id.* The doctrine of strict construction requires this court to use the plain meaning of the language employed. *Id.*

### Discussion

For their first point of appeal, appellants challenge the Commission's interpretation and application of Arkansas Code Annotated section 11–9–807(b) (Repl. 2012). Appellants contend that Howard is not entitled to temporary-total disability benefits as a matter of law because he received his full wages during the period of recovery from surgery. They take the position that they are entitled to an offset because Howard used his vacation to cover his time off from work. We disagree.

We note that neither party has provided us with an Arkansas appellate case that addresses this issue, likewise, our research has not revealed one. Appellants direct our attention to a 2011 ALJ opinion, *Winkley v. St. Edward Mercy Medical Center,* Claim No. G006579 (May 6, 2011),[1] that was affirmed and adopted by the Commission, but from which no appeal was taken to our court. Thus, we are faced with an issue of first impression and two seemingly conflicting.Commission decisions.

Arkansas Code Annotated section 11–9–807(b) provides. "(b) If the injured employ-

ee receives full wages during disability, he or she shall not be entitled to compensation during the period." "Wages" is defined in pertinent part as

the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer and includes the amount of tips required to be reported by the employer ... or the amount of actual tips reported, whichever amount is greater[.]

Ark.Code Ann. § 11–9–102(19) (Repl.2012).

In making their argument to us, appellants isolate and emphasize the word "rate" contained in the definition of wages, contending that "the definition of wages is synonymous with an employee's pay rate," and concluding that "[i]n light of this definition, the meaning of 'full wages' in Ark. Code Ann. § 11–9–807(b) must refer to a situation where the employee receives payments at the same *rate* at which he would have received had he worked." Appellants contend that, because Howard's vacation pay was the same rate as his regular pay, he received "full wages" during his period of disability. However, we think isolating the word "rate" in this manner distorts the plain meaning of the language employed in section 11–9–807(b). Instead, the entire phrase defining wages as "the money rate at which the service rendered is recompensed," from section 11–9–102(19), must be examined in order to determine the plain meaning of section 11–9–807(b). In doing so, we hold that "full wages" under 11–9–807(b) refers to the money rate paid to recompense services rendered and that vacation pay is that sum received as an employee benefit when *no* services are

1. (There, the ALJ concluded that payments received under a paid-leave program during the claimant's period of alleged disability constituted "full wages" under § 11–9–807(b).)

rendered. As generally explained in Larson's treatise on Workers' Compensation Law, "A second type of payment for which credit is usually disallowed is any kind of sick pay or vacation pay of which it can be said that the claimant's |₇entitlement to the payment is based on past service rather than on the injury as such." 4 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 82.06[3] (2012). That is the situation presented here.

 For their second point of appeal, appellants contend that substantial evidence does not support the Commission's finding that Howard is entitled to the additional medical treatment provided by Dr. Alvernia because the treatment was not reasonably necessary in connection with appellee's compensable injury. We disagree.

The additional medical treatment that was disputed by appellants was the back surgery and related treatment performed by Dr. Alvernia. Howard's counsel summarizes the issue facing us as, "The real issue in this case is whether the job-related injury caused a previously asymptomatic condition to become symptomatic and whether that symptomotology resulted in a need for the surgery that Dr. Alvernia performed in November of 2010."

The ALJ concluded that Howard had provided sufficient evidence to prove that his request for additional medical services was reasonably and necessarily related to his compensable injury sustained on August 18, 2010, explaining that Dr. Alvernia testified in his deposition that Howard had a degenerative back condition (spondylolisthesis) that had not been symptomatic prior to the work incident and that heavy lifting—such as that which caused the initial injury—could aggravate the preexisting spondylolisthesis. Dr. Alvernia explained that it was hard to tell if spondylolisthesis is induced from trauma

or a |₈degenerative condition, but that it could be aggravated by lifting a heavy object. He recognized that the claimant had an underlying degenerative condition in his back but further stated that he would not have recommended surgery if the condition had not become symptomatic. The doctor therefore concluded that the symptoms caused the need for surgery and that the job-related accident contributed to the need for surgery. Dr. Alvernia explained that if a person became symptomatic within twenty-four hours of a traumatic event, it would be likely that the trauma caused the onset of the symptoms, such as in Howard's case. The doctor finally testified that he considered the recommended surgery reasonably necessary from a medical standpoint. The ALJ credited the testimony of Dr. Alvernia, which was the judge's prerogative.

 It is the Commission's duty, not ours, to make credibility determinations, to weigh the evidence, and to resolve conflicts in the medical testimony. *Lankford v. Crossland Constr. Co.,* 2011 Ark. App. 416, 2011 WL 2141396. A covered employer is required by statute to provide an employee with such medical services as may be reasonably necessary in connection with the work-related injury. *Id.* The injured employee has the burden of proving by a preponderance of the evidence that the additional medical treatment requested was reasonable and necessary. *Id.* What constitutes reasonable and necessary is a question of fact for the Commission. *Id.* We conclude that reasonable minds could reach the Commission's conclusion, and we affirm the award of additional medical benefits.

 |₉As their final point of appeal, appellants contend that substantial evidence does not support the Commission's

finding that Howard is entitled to temporary-total disability benefits from November 16, 2010, through February 7, 2011, because the disability was the result of surgery that was unrelated to appellee's compensable injury. We disagree.

Dr. Alvernia stated that ten weeks was a reasonable amount of time to be off work under the circumstances. Because we have concluded that the Commission's decision under the preceding second point of appeal was supported by substantial evidence, it is clear that we must also affirm the award of temporary-total disability benefits for the period November 16, 2010, through February 7, 2011.

Affirmed.

VAUGHT, C.J., and ABRAMSON, J., agree.